UNITED STATES of America,
Plaintiff–Appellee,

v.

Marlow P. RUNNING, Defendant–
Appellant.

No. 92–3284.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1993.

Decided Oct. 13, 1993.

Gary R. Allen, Teresa T. Milton (argued), Bruce R. Ellisen, Dept. of Justice, Tax Div., Appellate Section, Washington, DC, for U.S.

Thomas G. Hodel (argued), Doussard, Hodel, Markman & Wells, Lakewood, CO, for Marlow P. Running.

Before EASTERBROOK and KANNE, Circuit Judges, and ENGEL, Senior Circuit Judge.*

KANNE, Circuit Judge.

The Internal Revenue Code requires employers to withhold federal social security and income taxes from the wages of their employees. *See* 26 U.S.C. §§ 3102 and 3402. The withheld taxes constitute a special fund held in trust for the benefit of the United States. *See* 26 U.S.C. § 7501(a); *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). Code section 6672, the so called "100% penalty provision," imposes personal liability on individuals responsible for paying federal withholding taxes from employee wages who willfully fail to do so. The United States government brought this suit to reduce to judgment an unpaid 100% assessment against Ralph Thiel and the appellant, Marlow Running. The district court entered judgment for the government and Running appealed. We conclude that Running did not willfully fail to remit withholding taxes and therefore reverse.

## I.

In 1980, Ralph Thiel formed Good Shepherd Health Facilities, Inc., located in Columbus, Wisconsin, to provide ownership and management services to nursing homes. Thiel was president of the company; Marlow Running, who joined Good Shepherd in 1981, and Robert Siebel were corporate officers. Running worked primarily with nursing

---

* The Honorable Albert J. Engel, Senior Circuit Judge for the Sixth Circuit, is sitting by designa-  tion.

homes managed by Good Shepherd, assisting with their accounting and financial reporting systems to ensure compliance with Medicare and Medicaid requirements. In 1982, Good Shepherd purchased Bethel Care Center, Inc., which operated a nursing home in Milwaukee. Running served as the vice president of Bethel. At the time of the purchase, both he and Siebel were aware that Bethel had financial problems.

In 1983, Nicki Rieckhoff was hired as Bethel's in-house administrator responsible for the day-to-day management and operation of the facility. Rieckhoff, who had signing authority on Bethel's bank account along with Running, Thiel, and Joanne Gmirek, Bethel's office manager, reported to Running on business matters and to Siebel on operational ones. In general, Rieckhoff paid Bethel's creditors, but testified at trial that she had to get authorization from Good Shepherd to pay any amount over $200.

In the spring of 1984, Running and Siebel, concerned about Good Shepherd's financial condition and the way Thiel was running the company, resigned. Running's resignation letter, dated April 23, 1984, stated that he was resigning "as the Vice-President of Finance and as a Director of Good Shepherd Health Facilities, Inc.[,] effective April 30, 1984." The letter makes no mention of Bethel; Running testified at trial that he assumed his resignation from Good Shepherd was a resignation from the entities it owned and operated.

Upon leaving Good Shepherd, Running and Siebel worked for Health Facilities Consultant, Inc. ("HFC"), in which they owned equal shares. The two formed HFC to provide management and consulting services to health care facilities on a fee for service basis. Running's work for HFC was substantially the same as the work he performed for Good Shepherd, and if relations between Running and Siebel on the one hand, and Thiel on the other, had cooled, they were not chilled. Indeed, HFC arranged to perform consulting services for five nursing homes managed by Good Shepherd. Under the management contracts between Good Shepherd and these facilities, each home would pay Good Shepherd for the consulting work done by HFC; Good Shepherd would pocket 25% of the fee and remit the remainder to HFC. HFC maintained an office in Siebel's home in Colorado. In addition, until March 1985, Running and Thiel shared office space in Columbus that had previously been occupied solely by Good Shepherd. The two men split rent and costs.

On May 1, 1984, HFC entered into a management and consulting agreement with Good Shepherd to manage Bethel. Under the terms of the agreement, HFC was to insure that Bethel complied "with the requirements of any statute, ordinance, law, rule, regulation or order of any governmental or regulatory body having jurisdiction in the premises." In addition, HFC was to "establish, supervise, direct and maintain" Bethel's accounting system; to "purchase the food, beverages, equipment, operating supplies and other material and supplies in the name of" Good Shepherd, and "cause vendors of services, inventory, equipment and supplies" to bill Good Shepherd and Bethel directly, which were to "promptly pay all such bills when due"; and to be responsible for recruiting, hiring, training, compensating, and firing Bethel employees.

For its services, HFC was to receive under the contract a fee of $1.50 per patient per day, but not less than $20,000 annually. There was no testimony that HFC specifically provided the aforementioned services; for what assistance HFC did provide, it was never compensated by Bethel or Good Shepherd.

Rieckhoff, Bethel's administrator, testified that when she called Good Shepherd's office in Columbus she usually spoke to Running, but sometimes spoke with Thiel. Rieckhoff stated that Thiel was out of the office most of the time and Running was more accessible. She also testified that, on approximately a monthly basis, she would get authorization from Running over the phone to make a purchase for more than $200. She assumed that Good Shepherd's corporate office was responsible for the payment of Bethel's withholding taxes because that is where she sent blank copies of the Employer's Quarterly Federal Tax Return forms (Form 941) when they arrived. According to Rieckhoff, Be-

thel's cash flow grew steadily worse during her tenure.

On June 18, 1984, Good Shepherd sent a memorandum to each of its administrators describing a "change in corporate structure." The memo, which lists Thiel, Running, and Siebel as the authors, states, in part:

> For some time, we have been discussing the proper way to structure Good Shepherd for maximum effectiveness to both secure additional facilities through purchase or leasing, as well as operating a management and consulting entity both for Good Shepherd facilities and for others who may need such a service. After considerable thought, we have seperated [sic] the two major functions into two seperate [sic] corporations, which, while cooperating very closely with one another, are legally seperate [sic] and distinct from one another.
>
> What is now in place for each facility is an agreement between Good Shepherd, as the owner, lessee, or primary contractor, and Health Facility Consultants, Inc., as the management firm responsible for the day to day ongoing management of each facility. Good Shepherd continues its ultimate obligation for the facility, and HFC will act as its agent in each situation concerning the operation of the facility.
>
> One impact of this change is a realignment of the three of us between the two corporations. Ralph will remain as President of Good Shepherd, and will continue to concentrate on expansion to new areas, and financing of the projects. Marlow and Bob have moved to Health Facility Consultants, with Bob serving as President, and Marlow as corporate Secretary and Treasurer, as well as remaining in charge of facility accounting and business office operations.
>
> While under the agreements, this change makes the administrators responsible to HFC, your relationship with each of us should remain unchanged. For any questions or concerns about the lease or property related issues, including the facility financing, Ralph remains the resource. For questions about the facility accounting, business office, insurance, or related issues, Marlow remains the individual in

charge, and for any other operational questions or concerns, please contact Bob.

Also in June 1984, Rieckhoff learned that the monthly Medicaid reimbursement due from the state of Wisconsin, which was ordinarily used to cover Bethel's payroll for the second half of each month, had been attached by the IRS. Rieckhoff testified that, to the best of her knowledge, this was the first time she was made aware of any problems with the IRS, though she did not recall if she was told why the IRS had attached the Medicaid reimbursement or the amount of money involved. Asked how she responded to the news of the attachment, Rieckhoff stated that she "called Columbus right away and ... talk[ed] to I believe it was Marlow Running." She told Running that the monthly Medicaid check was not forthcoming and that, as a result, she had no money to meet the payroll. Asked by counsel for the government if she notified Running "about the information [she] had received with regard to federal employment taxes," Rieckhoff said, "I don't recall at that time. Basically I, well, I knew that the money had been attached but I had no idea the amounts of moneys [sic] or what was due."

Bethel failed to pay federal withholding taxes for the second, third, and fourth quarters of 1984, and the first two quarters of 1985. Pursuant to § 6672, the IRS assessed taxes against Running in the amount of $136,615.12 for the last three quarters of 1984 and the first quarter of 1985. The government also made assessments against Thiel, Good Shepherd, and HFC in the amount of $147,535.34, for the last three quarters of 1984 and the first two quarters of 1985. In April 1989, the government brought suit against Running, Thiel, Good Shepherd, and HFC to reduce the unpaid portions of the assessments to judgment.

At trial, the government abandoned its claims against the two corporations because they were defunct. The district court found that Thiel, as "the person most in charge of the overall operation of Bethel," was responsible for paying Bethel's federal withholding taxes for the five quarters with which he was charged and had willfully failed to do so. Turning to Running, the court found that he

was "significantly involved in the operation" of Bethel. In particular, the court determined that Running was an officer of Bethel who had management responsibilities under the 1984 managing and consulting agreement between HFC and Good Shepherd. According to the court, this documentary evidence, together with the testimony of Rieckhoff, "seal[ed] his fate." However, the court found that Running was able, in time, to put sufficient distance between himself and Bethel's operation, in "sort of a weaning situation," to absolve him of liability for some of the quarters charged by the government. Accordingly, the court found Running liable for the assessments made against him for the second and third quarters of 1984, but not for the fourth quarter of 1984 and the first quarter of 1985. Final judgment against Thiel in the amount of $240,594.77, and against Running in the amount of $75,438.73, was entered on August 11, 1992. Only Running appeals. We have jurisdiction under 28 U.S.C. § 1291.

## II.

Title 26 U.S.C. § 6672(a) states:

Any person required to collect, truthfully account for, and pay over any tax imposed by this Title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable for a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

"Person," as used in section 6672(a) "includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." 26 U.S.C. § 6671(b).

■ There is a dispute between the parties over who bears the burden of proving responsibility and willfulness under section 6672. "In this circuit, as in others, '[i]t is axiomatic that ... the Commissioner's tax deficiency determinations are to be presumed correct.'" *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.1990) (quoting *Barnes v. Commissioner*, 408 F.2d 65, 68 (7th Cir.), *cert. denied*, 396 U.S. 836, 90 S.Ct. 94, 24 L.Ed.2d 86 (1969)). Thus, we think it well settled that, "once the government presents an assessment of liability, the taxpayer bears the burdens of production and persuasion" with respect to both the responsibility and willfulness issues. *Ruth v. United States*, 823 F.2d 1091, 1093 (7th Cir.1987). *See also Schroeder*, 900 F.2d at 1148; *Sawyer v. United States*, 831 F.2d 755, 758 (7th Cir.1987); *Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir.1993); *Barnett v. IRS*, 988 F.2d 1449, 1453 (5th Cir.1993); *Hochstein v. United States*, 900 F.2d 543, 546 (2d Cir. 1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 2967, 119 L.Ed.2d 587 (1992). Thus we turn to the only question presented by this case, namely, whether the district court's findings on these two issues are clearly erroneous. *Wright v. United States*, 809 F.2d 425, 426 (7th Cir.1987); *Raba v. United States*, 977 F.2d 941, 943 (5th Cir.1992); *Caterino v. United States*, 794 F.2d 1, 3 (1st Cir.1986), *cert. denied*, 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987).

■ "A person is *responsible* under § 6672 if he retains 'control of finances within the employer corporation: the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.'" *Sawyer*, 831 F.2d at 758 (quoting *Haffa v. United States*, 516 F.2d 931, 936 (7th Cir.1975)). *See also Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). "It is sufficient that the person involved have significant control over the disbursal of corporate funds." *Purdy Co. of Ill. v. United States*, 814 F.2d 1183, 1188 (7th Cir.1987). *See also Ruth*, 823 F.2d at 1094; *Adams v. United States*, 504 F.2d 73, 75 (7th Cir.1974). Significant does not mean exclusive, however; more than one individual can be a responsible person within the meaning of the statute. *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir.1992); *Wright*, 809 F.2d at 427; *Adams*, 504 F.2d at 75–76; *Monday*, 421 F.2d at 1214; *Elmore v. United States*, 843 F.2d 1128, 1134 (8th Cir.1988).

The district court found Running liable for the second and third quarters of 1984, thus we review the record for evidence of Running's responsibility and willful failure to pay withholding taxes for those periods. We point out that Running was employed by Good Shepherd for only one month, April, in this time period. The remaining five months he worked for HFC, which had a contract with Good Shepherd to provide consulting and management services to Bethel.

■ The district court concluded Running was a responsible person because he was an officer of Bethel, he possessed management responsibilities under the management and consulting agreement between Good Shepherd and HFC, and (based on Rieckhoff's testimony) had sufficient control over the facility's financial affairs. Running contends the document listing him as the Secretary–Treasurer of Bethel, a United States Department of Health and Human Services Ownership and Control Interest Disclosure Statement, was prepared before he resigned from Good Shepherd and is thus irrelevant because his resignation from Good Shepherd was also a resignation from the entities controlled by Good Shepherd. The district court was entitled to find otherwise. Running's resignation letter makes no mention of Bethel, and there is no evidence that he ever renounced his position in that facility.

■ Running also complains that the May 1984 management and consulting agreement was never followed and that he never benefitted financially under the agreement. True, HFC may not have been paid for any services provided under the agreement, but compensation is not the touchstone for liability under section 6672. Moreover, while HFC may never have performed the services specified in the agreement, the contract expressly charged HFC, and thus Running, with certain responsibilities. These included insuring Bethel's compliance "with the requirements of any statute, ordinance, law, rule, regulation or order of any governmental or regulatory body having jurisdiction in the premises," as well as supervising the facility's accounting system.

More importantly, though Running disputes Rieckhoff's testimony that she was required to get approval from Columbus for expenditures over $200 and on occasion received that approval from Running, the district court could logically conclude that this assistance came within the ambit of the management and consulting agreement and was, contrary to Running's assertions, more than sporadic. Running's real complaint is that the district court credited Rieckhoff's testimony over his own. We will not disturb the district court's credibility determinations, however. The finding that Running was a responsible person because he was an officer of Bethel, had contracted with Bethel to oversee its accounting operation, and participated in some decisions concerning the payment of creditors and the disbursal of Bethel's funds, is not clearly erroneous.

■ Whether Running acted willfully is more problematic. In *Monday*, we held that the term "willfully" in section 6672 referred to "voluntary, conscious, and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the Government." 421 F.2d at 1216. *See also Garsky v. United States*, 600 F.2d 86, 91 (7th Cir.1979). We recently reaffirmed this definition in *Domanus v. United States*, 961 F.2d 1323 (7th Cir.1992), where we rejected the argument that *Monday*'s definition was incorrect and that to establish willful conduct under section 6672, a civil tax statute, there must be proof of an intentional violation of a known legal duty, the standard applied in criminal tax prosecutions.[1]

■ Rather, a responsible person acts willfully when he permits funds of the corporation to be paid to other creditors when he is aware that withholding taxes due to the government have not been paid. *Bowlen*, 956 F.2d at 729; *Purdy Co. of Ill.*, 814 F.2d at 1188; *Garsky*, 600 F.2d at 91. "Liability does not depend upon the presence of bad motive or the specific intent to defraud the Government or deprive it of revenue." *Monday*, 421 F.2d at 1216. Indeed, the willfulness requirement of section 6672 may be

---

**1.** *Domanus* dealt specifically with the meaning of the term "willfully" in § 6672, and did not ad-dress the burden of proof in an action under that statute.

satisfied if the responsible person acts with a reckless disregard of a known risk that the trust funds have not been remitted to the government. *Sawyer*, 831 F.2d at 758; *Garsky*, 600 F.2d at 91; *Monday*, 421 F.2d at 1215. Reckless disregard in this context is tantamount to gross negligence and is established if the responsible individual "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Wright*, 809 F.2d at 427. Recklessness may also be established if a responsible person fails "to correct mismanagement after being notified that the withholding taxes have not been duly remitted." *Garsky*, 600 F.2d at 91.

In the case before us, the district court determined that Thiel had acted willfully, but made no such finding with respect to Running.[2] Running maintains that he knew of Bethel's financial problems early on, but "rather than subject[ ] himself to the obvious risk that the employment taxes may go unpaid, he resigned." He insists that, at the time of his resignation, Bethel was current in paying withholding taxes. Thereafter, notwithstanding his phone conversations with Rieckhoff about certain expenditures, he was unaware Bethel had not paid taxes for the second and third quarters of 1984. According to Running, once he left Good Shepherd he was "no longer privy to the information pertaining to employment tax deposits nor was he in a position to find out for certain" Bethel's tax situation.

In support of his argument, Running points out that Bethel's 1983 Annual Federal Unemployment Tax Return (Form 940), which he signed, was timely filed. However, Bethel's Quarterly Tax Return (Form 941) for the first quarter of 1984, which was due on April 30, 1984, was signed by Thiel and filed late.[3] The quarterly returns for the remainder of 1984, signed either by Cheryl Bass, Bethel's office manager, or Rieckhoff, were filed late, and show that no employment taxes had been deposited.

In response, the government has produced no evidence that Running was responsible for preparing or filing Bethel's tax returns once he left Good Shepherd, or that he actually knew Bethel had not paid its withholding taxes for the second and third quarters of 1984, yet directed or approved payments to other creditors. Rather, the government argues that Running's actions amounted to reckless disregard of a known risk that withholding taxes had not been paid. *See Wright*, 809 F.2d at 427. The government makes much of Running's admission that he was aware of Bethel's financial problems while employed by Good Shepherd, but knowledge of financial distress, without more, does not equate to knowledge that the facility was not meeting its tax obligations.

The only evidence summoned by the government to fill the gap is Rieckhoff's June 1984 telephone call in which she thought she told Running that the monthly Medicaid check was not forthcoming and she lacked funds to meet the payroll. However, Rieckhoff was uncertain if she told Running why the check was not on its way, and there is no evidence that she ever informed him of Bethel's tax delinquencies. Moreover, although the record does not disclose why the IRS attached the June 1984 Medicaid check, it is clear that this action did not relate to the quarters for which Running was found liable. The second quarter return was not due until July 31; the third quarter return until Octo-

---

**2.** Moreover, we are unable to identify any facts supporting the district court's conclusion that, over time, Running "put enough distance between himself and the actual operation of Bethel to escape some of the responsibility sought to be imposed upon him by the government." The record does not indicate that Running's contact with Bethel after his resignation changed appreciably from May of 1984 through the beginning of 1985.

**3.** We note that this return was due on April 30, 1984, the effective date of Running's resignation. That total deposits were less than Bethel's tax liability subtracts somewhat Running's claim that, while he was employed by Good Shepherd, Bethel was current in paying withholding taxes. Nevertheless, the return shows that substantial amounts of employment taxes were deposited during that quarter. The total tax liability for this period was $54,849.87; total deposits equalled $42,850.00. Furthermore, we do not think these figures are particularly relevant to the issue before us because the government did not assess taxes against Running for the first quarter of 1984.

ber 31. The attachment possibly related to the first quarter, but the government did not assess taxes against Running for that period. On this record, we are unable to conclude that Running ought to have known that Bethel was not paying withholding taxes and therefore acted willfully. The government's offerings do not remedy the absence of a district court finding on the issue of willfulness under section 6672. Accordingly, the decision of the district court is REVERSED.