Lee N. MORTENSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

James M. FAWCETT, Jr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Nos. 92 C 2710, 92 C 2711.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 8, 1995.

Larry David Blust, Paula Cozzi Goedert, Jenner & Block, Chicago, IL, for Lee N. Mortenson, James M. Fawcett, Jr.

Madeleine Sullivan Murphy, United States Attorney's Office, Chicago, IL, Charles T. Cannon, U.S. Dept. of Justice, Tax Division, Washington, DC, for U.S.

Jack Donatelli, United States Attorney's Office, Chicago, IL, for U.S.

## MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

On February 10, 1988, Lee N. Mortenson ("Mr. Mortenson") and James M. Fawcett ("Mr. Fawcett") were assessed a 100 percent penalty in the amount of $694,887.42 pursuant to 26 U.S.C. § 6672. Messrs. Mortenson and Fawcett subsequently brought these lawsuits against the United States government seeking a refund and abatement of the penalty, and the government brought counterclaims to recover the unpaid portion of the penalty. The government now brings this motion *in limine* to exclude evidence from the trial of these consolidated cases. For the reasons stated herein, the motion is granted.

### Stipulated Facts

The parties have stipulated to the following facts for purposes of this motion. Opeleika Manufacturing Corporation ("Opeleika") was a publicly-held Illinois corporation engaged in the business of manufacturing textiles. Opeleika maintained its headquarters in Chicago, Illinois, but had manufacturing plants and divisional headquarters in Alabama, Arkansas, Georgia, Illinois, Michigan, New York and the Barbados. During the relevant period, Opeleika employed several thousand persons at its various locations. Approximately 61 percent of Opeleika's outstanding stock was owned by Technical Equipment Leasing Corporation ("Telco"), another publicly-held company, during the relevant period. Opeleika filed for reorganization under the federal bankruptcy laws on May 23, 1985. Opeleika was unsuccessful in achieving a reorganization and was liquidated by the bankruptcy court without paying $694,887.42 in withholding taxes for its employees.

In January, 1984, Mr. Mortenson was hired as the President and Chief Operating Officer of Telco. On August 31, 1984, Telco

named him President and Chief Executive Officer of Opeleika, which was then experiencing financial difficulties. Mr. Mortenson served as President and Chief Executive Officer through December, 1986. He was elected a director of Opeleika in March, 1985, and served in that capacity through December, 1986. He never owned any stock of Opeleika, nor was he a shareholder of Telco during the relevant period. As President of Opeleika, Mr. Mortenson had the authority to sign checks for Opeleika, hire and fire employees, make financial decisions, and sign loans and other documents authorized by the Board of Directors.

In June, 1977, Mr. Fawcett became a director of Telco. He served as director and Vice Chairman of Telco's Board through December, 1985. In June, 1983, Mr. Fawcett became a director of Opeleika, and on August 31, 1984, he was named Vice Chairman of Opeleika's Board of Directors. He remained a director and Vice Chairman of Opeleika's Board through March, 1986. Mr. Fawcett was employed by Opeleika to assist its President with special projects. He never served as an officer of Opeleika nor owned any Opeleika stock. As an Opeleika employee, Mr. Fawcett was an authorized signatory on some bank accounts but he never signed checks. He lacked the authority to hire and fire employees, make financial decisions, or determine which creditors were to be paid. His first and primary special project was the refinancing of Opeleika's debt, which occurred in November, 1984.

On November 28, 1984, Opeleika's debt was partially refinanced with a group of financial institutions headed by Congress Financial Corporation ("Congress"). As security for its loans, Congress obtained perfected security interests in all of Opeleika's accounts receivable, inventory, machinery and equipment, trademarks and patents, the stock of its subsidiaries, and the proceeds of all of such assets. Opeleika's real estate remained mortgaged to other lenders. Pursuant to the loan agreement, Opeleika was required to and did notify all of its customers to send their payments directly to a lock box under the sole control of Congress. Congress subsequently advanced funds on a daily basis on Opeleika's request. These funds were deposited in Opeleika's bank accounts and used to pay its bills. Under this arrangement, Opeleika had no funds available to pay bills except those funds advanced by Congress. Under the loan agreement, Congress agreed to extend to Opeleika a line of credit in an amount up to a specified percentage of the value of Opeleika's inventory and accounts receivable. The excess of this amount over the amount already advanced to Opeleika at any given time was referred to as Opeleika's "availability" of funds. If Opeleika had already borrowed an amount equal to or in excess of its maximum line (*i.e.*, there was no availability), Congress was not required by its loan documents to advance any more funds and could apply the funds it received from Opeleika's customers to reduce its advances to the maximum that it was required to extend.

A few weeks before the Congress loan was funded, Congress informed Mr. Fawcett that employment taxes were delinquent. Messrs. Mortenson and Fawcett had previously been unaware of this delinquency. These taxes were paid from the proceeds of the Congress loan.

After the loan closing, Mr. Mortenson instructed Arthur J. Rabin ("Mr. Rabin"), the Assistant Treasurer, to treat the payment of employment taxes as a top priority. Neither Mr. Mortenson nor Mr. Fawcett were involved in the process of paying payroll or payroll taxes. Mr. Rabin, who was appointed Treasurer of Opeleika on January 29, 1985, was responsible for preparing, reviewing, filing and signing employment tax returns and depositing employment taxes. During the relevant period, Mr. Rabin reported to Roy Younger, Opeleika's Chief Financial Officer, who in turn reported to Mr. Mortenson. By letter dated December 12, 1984, Congress informed Mr. Rabin that he was required to provide Congress with copies of all depository slips or cancelled checks for all tax payments, including federal withholding taxes on a daily basis, under the terms of the loan agreement. After the closing of the Congress loan, federal withholding taxes were properly deposited and returns timely filed through the week of December 5, 1984. Nevertheless, beginning in mid-December, 1984, and continuing sporadically through

January, 1985, Mr. Rabin failed to deposit federal withholding taxes, using the funds provided for this purpose to pay others instead. Withholding taxes for the period between February 12, 1985 and May 23, 1985, the date upon which Opeleika filed bankruptcy, were paid as required.

In January, 1985, Opeleika's auditors determined that Opeleika had an inventory shortage of approximately $3,000,000 and informed Messrs. Mortenson and Fawcett that Opeleika's December 31, 1984, inventory was overstated by approximately that amount. This decrease in Opeleika's inventory value caused the Congress loan to exceed the maximum availability. Messrs. Mortenson and Fawcett informed Congress of this shortage and scheduled a meeting with Congress representatives to discuss how to proceed under circumstances where Congress was no longer required to advance funds to Opeleika and could, if it desired, declare the loan immediately due and apply all funds received to reduce the amount due to Congress. The Congress loan was constantly over its limit and in default from the discovery of the inventory shortage until Opeleika filed bankruptcy in May, 1985.

On February 10, 1985, Mr. Rabin informed Mr. Fawcett about the unpaid withholding taxes which had accrued during the prior two months. Mr. Fawcett in turn informed Mr. Mortenson. Prior to February 10, 1985, neither Mr. Fawcett nor Mr. Mortenson were aware that such taxes were not deposited or had any reason to believe that Mr. Rabin was not carrying out Mr. Mortenson's prior instructions to deposit these taxes. Shortly thereafter, Mr. Mortenson asked Congress to fund additional amounts to pay the back withholding taxes and to enable Opeleika to continue to operate. Congress, however, refused to advance additional funds to pay the past due federal withholding taxes. Congress agreed to fund specific expenditures which it deemed necessary for Opeleika to continue to operate, such as current wages, raw materials, and utilities.

After February 12, 1985, Congress changed its funding practices because Opeleika had no loan availability and any additional advances by Congress were strictly voluntary. Congress began requiring that Opeleika representatives submit daily funding requests to Congress. Congress representatives subsequently determined which of these requests should be paid, reported its decisions to the Opeleika representatives, and advanced to Opeleika funds sufficient to pay only these amounts. These funds were transferred to Opeleika's accounts and Opeleika made the payments specified by Congress. Opeleika had no other funds except those advanced by Congress to pay its obligations. All payroll taxes due for periods after February 12, 1985, and prior to Opeleika's May 23, 1985 bankruptcy filing were paid with funds advanced by Congress.

After February 12, 1985, Opeleika requested and received funds from Congress in excess of the amount of the unpaid withholding taxes. These funds were advanced for the specific purpose of paying current wages, including current payroll taxes, buying raw materials, and covering other operating expenses approved by Congress. While Messrs. Mortenson and Fawcett did not personally make the daily requests to Congress for funds, they knew that other creditors of Opeleika were being paid from funds advanced by Congress after February 12, 1985, and that the payroll taxes for periods prior to February 12, 1985, remained unpaid.

Starting in March or early April, 1985, representatives of the Internal Revenue Service ("IRS") met with Mr. Fawcett and others at Opeleika to negotiate a plan to remit the unpaid payroll taxes. The IRS representatives emphasized the importance of keeping payroll taxes current and indicated their willingness to accept payment over time of the back taxes if Opeleika kept current. Since Congress was willing to fund current payroll taxes, Opeleika was able to comply with the requirement for current payment. Messrs. Mortenson and Fawcett hoped that they could obtain financing from either Congress or Telco to pay the unpaid withholding taxes if a reasonable payment plan could be negotiated. During April or May, 1985, Mr. Fawcett and other Opeleika representatives continued to negotiate with the IRS for a plan to pay the remaining December, 1984 and January, 1985 withholding taxes. They were not able to negotiate a plan acceptable to Con-

gress before Opeleika declared bankruptcy on May 23, 1985.

### Liability for Withholding Taxes Under the Internal Revenue Code

██ The Internal Revenue Code ("Code") requires employers to withhold federal income and social security taxes from their employees' wages. *See* 26 U.S.C. § 3102, 3402; *United States v. Running*, 7 F.3d 1293, 1294 (7th Cir.1993). The withheld taxes are deemed to be a special fund held in trust for the benefit of the government. 26 U.S.C. § 7501(a); *Slodov v. United States*, 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). As such, they may not be used as working capital for the business. *Cline v. United States*, 997 F.2d 191, 194 (6th Cir.1993) (citations omitted). If an employer withholds the taxes, the employee is credited with having paid them regardless of whether the employer turns the taxes over to the government. *Bowlen v. United States*, 956 F.2d 723, 726 (7th Cir.1992). The government's only recourse for the payment of the withholding taxes is against the employer or against the persons responsible for remitting the taxes to the government. *Id.* (citation omitted); *Cline v. United States, supra*, 997 F.2d at 194 (citation omitted).

> Section 6672 of the Code provides in part: Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). This statute, often referred to as the "100% penalty provision," imposes personal liability on individuals who are responsible for remitting federal withholding taxes from employee wages to the government but who willfully fail to do so. *United States v. Running, supra*, 7 F.3d at 1294.

██ To be liable under § 6672, an individual (1) must be a "responsible person" of the delinquent corporation, and (2) must have willfully failed to carry out the responsibilities that the tax code imposes on him or her. *Bowlen v. United States*, 956 F.2d 723, 727 (7th Cir.1992) (citations omitted). Once the government has assessed an individual for nonpayment of trust fund taxes under § 6672, the individual "bears the burdens of production and persuasion to disprove his status as a responsible person who willfully failed to collect, account for, or pay over the taxes." *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir.1994) (citation omitted). Accordingly, to escape liability in this case, Messrs. Mortenson and Fawcett must show either that they were not "responsible persons" or that their actions were not "willful."

### A. Responsible Person

██ An individual is a "responsible person" under § 6672

> if he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations. To be responsible under section 6672, a person need not necessarily have exclusive control over the disbursal of funds or have the final word as to which creditors should be paid so long as he has significant control.

*Bowlen v. United States, supra*, 956 F.2d at 728 (citations omitted). In other words, one is responsible if he or she "could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees." *Thomas v. United States, supra*, 41 F.3d at 1113 (citation omitted). More than one individual can be responsible under § 6672. *Id.* Courts have recognized several indicia of "responsible person" status, including the authority to sign checks on corporate accounts or to prevent their issuance, exercise of control over daily bank accounts and disbursement records, involvement in the management of day-to-day affairs of the company, ownership of stock, holding of corporate office, and the ability to hire and fire employees. *Id.* at 1114 (citations omitted); *United States v. Rem*, 38 F.3d 634, 642 (2d Cir.1994) (citations omitted). To effectuate the purposes of § 6672, "courts generally take a broad view of who qualifies as a

responsible person." *United States v. Rem, supra*, 38 F.3d at 642 (quotation omitted).

### B. *Willfulness*

 As used in § 6672, the term "willful" refers to "voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the government." *Thomas v. United States, supra*, 41 F.3d at 1114 (citation omitted). Willfulness does not require a "specific fraudulent intent or evil motive;" rather, an individual "willfully" fails to turn over withheld taxes to the government if he permits the disbursal of funds to other creditors when he is aware that the employer has not paid withholding taxes owed to the government. *Id.* (citations omitted); *United States v. Running, supra*, 7 F.3d at 1298. "It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States." *Greenberg v. United States*, 46 F.3d 239, 244 (3d Cir.1994) (citations omitted).

### C. *Admissibility of the Proffered Evidence*

To show that they were not "responsible persons" acting willfully to avoid payment of withheld funds to the government, Messrs. Mortenson and Fawcett seek to introduce evidence of the negotiations between Opeleika representatives and the IRS and the financial arrangements between Opeleika and Congress. The government contends that this evidence is irrelevant to the issues of responsibility and willfulness and is therefore inadmissible.

### 1. *IRS Negotiations*

 The government seeks to exclude evidence relating to meetings between Opeleika and IRS representatives in March or April, 1985, for the purpose of negotiating a plan to pay the delinquent withholding taxes. During these negotiations, the IRS emphasized to Mr. Fawcett the importance of remitting current payroll taxes and indicated a willingness to accept a later payment of the back taxes as long as the current payroll taxes were timely paid. There is no suggestion that the IRS ever relieved Opeleika or its corporate officers of the responsibility to re-mit the delinquent taxes for December, 1984 or January, 1985, which defendants had known about since early February. In these circumstances, the Seventh Circuit has held that such meetings are irrelevant to a Section 6672 willfulness determination. *See Monday v. United States*, 421 F.2d 1210, 1217–18 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970). *See also Wall v. United States*, 592 F.2d 154, 163 (3d Cir.1979) (district court properly excluded evidence of plaintiff's negotiations with IRS agents regarding payment of delinquent withholding taxes). Accordingly, evidence relating to these negotiations will be excluded.

### 2. *Financial Arrangements with Congress*

The government also seeks to exclude evidence relating to the financial arrangements between Opeleika and Congress. In support of its position, the government cites *Kalb v. United States*, 505 F.2d 506 (2d Cir.1974), *cert. denied*, 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975), in which two corporate officers argued that they were not personally liable under Section 6672 because a bank controlled their company's finances and thwarted their attempts to pay withholding taxes to the government. The bank, which had provided financing for the business, had threatened to withdraw its line of credit when the company's financial condition began to deteriorate. Subsequently, the bank agreed to continue financing on the condition that a bank representative would be permitted to oversee the company's financial operations. The officers insisted that they had always included taxes in the list of debts forwarded to the bank for approval of payment, but that the bank refused to approve payment. As a result, the company did not remit withholding taxes to the government although it continued to withhold taxes from its employees' wages. *Id.* at 508, 510.

The Second Circuit rejected the officers' contention that the financial arrangements between the bank and the corporation shielded them from Section 6672 liability and affirmed the district court's directed verdict in the government's favor on the issue of responsibility. The Court explained:

To permit corporate officers to escape liability under section 6672 by entering into agreements which prefer other creditors to the government would defeat the entire purpose of the statute.... [A]s section 7501(a) makes explicit, withholding taxes are held in trust. We cannot imagine that in any other context a trustee could avoid his obligations by entering into an agreement by which funds entrusted to him are used to pay his other obligations. Similarly, we will not permit appellants so to escape their obligations here.

*Id.* at 510.

Other courts have either explicitly or implicitly embraced this reasoning, rejecting the argument that otherwise "responsible persons" can escape § 6672 liability by delegating to a third party the authority to select which creditors will be paid.[1] The Seventh Circuit has not directly considered this issue, but it has repeatedly recognized that a "responsible person" cannot evade liability by delegating his duty to turn over withholding taxes. *See Bowlen v. United States, supra,* 956 F.2d at 728; *United States Internal Revenue Service v. Charlton,* 2 F.3d 237, 240 (7th Cir.1993) ("[t]he delegation of disbursal authority does not relieve the delegator of liability") (citation omitted). *Accord, Purcell v. United States,* 1 F.3d 932, 937 (9th Cir.1993); *Kinnie v. United States,* 994 F.2d 279, 284 (6th Cir.1993); *Thomsen v. United States,* 887 F.2d 12, 17 (1st Cir.1989).

▪ Messrs. Mortenson and Fawcett argue that *Kalb* and its progeny are not appli-cable here because the *Kalb* line of cases involved situations in which a "responsible person" entered into an arrangement with a lender to advance funds sufficient to cover only *net* payroll. In contrast, in the present case Congress advanced funds sufficient to cover *gross* payroll, including current withholding taxes, and refused only to provide funding for certain back withholding taxes. This factual distinction does not aid the plaintiffs, however, because the reasoning of *Kalb* still applies. Although Opeleika's tax debt to the government was not increasing during this period, as it was in *Kalb,* Opeleika still had a tax obligation to the government and was paying debts to other creditors ahead of it. Messrs. Mortenson and Fawcett, like the plaintiffs in *Kalb,* are liable to the extent they "enter[ed] into agreements [with Congress] which prefer[red] other creditors [of Opeleika] to the government." *Kalb, supra,* 505 F.2d at 510.

Messrs. Mortenson and Fawcett also attempt to avoid *Kalb* by claiming that they did not have legal control over Opeleika's funds and therefore *Kalb* should not apply. In *Kalb,* however, the plaintiffs also claimed that they did not have legal control over their funds. *Kalb* indicates that whether the plaintiffs had legal control over the funds is irrelevant to their status as responsible persons when they "voluntarily entered into and at all times acceded to the arrangement [relinquishing control over payment to the creditors]," surrendering control "as part of the consideration for the bank's continuing financing of [the corporation.]" *Id.* at 510.[2]

---

1. *See, e.g., McDonald v. United States,* 939 F.2d 916 (11th Cir.1991), *cert. denied,* 503 U.S. 984, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992); *Williams v. United States,* 931 F.2d 805 (11th Cir.1991); *Hochstein v. United States,* 900 F.2d 543, 545–48 (2d Cir.1990); *Commonwealth Nat'l Bank of Dallas v. United States,* 665 F.2d 743, 757–58 (5th Cir.1982); *Emshwiller v. United States,* 565 F.2d 1042, 1045–46 (8th Cir.1977); *United States v. Durham,* 94–2 USTC ¶ 50,331, 1994 WL 421448, at *3 (N.D.Okla. May 17, 1994); *Finley v. United States,* 839 F.Supp. 1484, 1489 (D.Kan.1993); *Lack v. United States,* Civ. A. No. 91–11520, 1993 WL 565986, at *11–12 (D.Mass. Oct. 4, 1993); *Tsouprake v. United States,* 797 F.Supp. 962, 967 n. 12 (S.D.Fla. 1992); *Miller v. United States,* 91–1 USTC ¶ 50,-141, 1991 WL 53259, at *4–5 (S.D. Iowa Mar. 7, 1991); *Bonnabel v. United States,* 744 F.Supp.

85, 88–90 (D.N.J.1990); *Marshall v. United States,* 89–1 USTC ¶ 9150, 1988 WL 142191, at *4 (N.D.Ill.Dec. 28, 1988); *United States v. Davidson,* 558 F.Supp. 1048, 1054–55 (W.D.Mich.1983); *Totaro v. United States,* 533 F.Supp. 71, 74–75 (W.D.N.Y.1981), *aff'd,* 697 F.2d 298 (2d Cir.1982); *Taubman v. United States,* 499 F.Supp. 1133, 1140–42 (E.D.Mich. 1978), *aff'd,* 635 F.2d 1215 (6th Cir.1980).

2. Plaintiffs argue that applying this rule would make it impossible for a business that owed back payroll taxes to continue operating, even if it were in the creditors' best interest. Although it may be more difficult to obtain financing, such a business could continue to operate as long as the creditors agreed to fund payment of the back taxes, as Opeleika could have insisted that Congress do here.

The cases cited by the plaintiffs do not convince me otherwise. In *First American Bank and Trust Co. v. United States*, No. CIV–77–0472–B, 79–1 USTC ¶ 9205, 1979 WL 1292 (W.D.Okla. Jan. 26, 1979), the I.R.S. sought to recoup tax liability from the bank financing the delinquent corporation, not from the officers of the corporation. *Id.* The court found *First American* liable for failing to use the corporation's funds to pay its borrower's tax liability, but did not address whether the principals were also liable under *Kalb*. Analogizing *First American* to the present case, therefore, only shows that Congress may be held liable for the tax obligation. *First American* does not speak to the liability of Messrs. Fawcett or Mortenson.

Neither of the other two cases cited by the plaintiffs, *United States v. Falino*, 441 F.Supp. 153 (E.D.N.Y.1977) and *United States v. Vaccarella*, 735 F.Supp. 1421 (S.D.Ind.1990), *aff'd on other grounds sub nom. United States v. Security Pacific Business Credit Inc.*, 956 F.2d 703 (7th Cir.1992), addressed *Kalb*. The district court in *Vaccarella*, while holding the lending bank liable for the unpaid taxes, held that the chief executive officer and the treasurer of the defunct company that had failed to pay withholding taxes were not liable for payment of the taxes. The government did not appeal from the ruling in favor of the company officers. While the two officers were arguably in different positions in terms of control of finances at one point in time,[3] the court's holding as to either would not appear to survive the Seventh Circuit's decision in *Thomas v. United States, supra.* In *Thomas,* the court upheld a verdict against individuals who wrote and signed payroll checks but who had no ability to force their superior to pay the taxes which the superior refused to do.[4]

Messrs. Mortenson and Fawcett also argue that they had no knowledge of taxes owed to the government prior to the arrangement between Opeleika and Congress. At the time they learned of the delinquency, the withheld funds had already been expended and Congress had the discretion to disburse all funds acquired thereafter. They analogize their situation to that of the petitioner in *Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), who assumed managerial control of three corporations at a time when the companies were delinquent in paying federal withholding taxes, when any trust fund taxes that had previously been collected had been dissipated, and when the companies had no liquid assets with which to pay the delinquent taxes. In *Slodov,* the Supreme Court held that the petitioner did not violate § 6672

> by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated [were] not directly traceable to collected taxes referred to by that statute.

*Id.* at 259–60, 98 S.Ct. at 1791–92.

*Slodov,* however, is inapposite. The petitioner in *Slodov* became a "responsible person" of the corporations after the tax debt was incurred and after the corporations had dissipated all taxes that had been collected previously. Messrs. Mortenson and Fawcett are alleged to have been "responsible persons" throughout the period in which the tax liability accrued. An individual who is a

---

**3.** One officer was the CEO and chief shareholder and had been in this position throughout the company's existence while the other became treasurer after the financial arrangements that were at issue were in place. The district court relied on Judge Newman's dissent in *Hochstein v. United States*, 900 F.2d 543 (2d Cir.1990). Judge Newman's reasoning might be applicable to the treasurer but would not seem to affect the liability of the CEO. Mr. Hochstein had been a company controller who was refused money to pay withholding taxes.

**4.** In addition to disregarding *Kalb*, the court in *Falino* also held that only persons "who have 'the final word as to what bills should or should not be paid, and when,' " could be held liable for the taxes. *Falino, supra,* 441 F.Supp. at 157 (quoting *Pacific National Insurance v. United States*, 422 F.2d 26, 31 (9th Cir.), *cert. denied*, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970)). The Seventh Circuit has explicitly rejected this contention, concluding that a person may be a "responsible person" under the statute if he has "significant control" over which creditors should be paid. *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir.1992).

"responsible person" before and after withholding tax liability accrues is not protected by *Slodov.* Such an individual has

> a duty to use unencumbered funds acquired after the withholding obligation becomes payable to satisfy that obligation; failure to do so when there is knowledge of the liability ... constitutes willfulness.

*Garsky v. United States,* 600 F.2d 86, 91 (7th Cir.1979) (quoting from *Mazo v. United States,* 591 F.2d 1151, 1157 (5th Cir.1979)). *Accord, Thomas v. United States, supra,* 41 F.3d at 1114, 1116. *See also Davis v. United States,* 961 F.2d 867, 871–78 (9th Cir.1992), *cert. denied,* 506 U.S. 1050, 113 S.Ct. 969, 122 L.Ed.2d 124 (1993).

 Messrs. Mortenson and Fawcett argue that they had no "unencumbered" funds with which to satisfy Opeleika's withholding tax obligation. They insist that they could not have used the funds provided by Congress to satisfy this obligation because these funds were "encumbered." Although the Seventh Circuit has not yet adopted an operative definition of "encumbered" funds, two other circuit courts have adopted the following definition set forth in *In re Premo,* 116 B.R. 515, 535 (Bankr.E.D.Mich.1990):

> [w]here the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS, the funds are regarded as encumbered if those restrictions preclude the taxpayer from using the funds to pay the trust fund taxes.

*Honey v. United States,* 963 F.2d 1083, 1090 (8th Cir.), *cert. denied,* 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); *Barnett v. Internal Revenue Service,* 988 F.2d 1449, 1458 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993). In adopting this definition, the Eighth Circuit emphasized that

> funds are encumbered only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability if that legal obligation is superior to the interest of the IRS in the funds.

*Honey v. United States, supra,* 963 F.2d at 1090. Messrs. Mortenson and Fawcett bear the burden of proving that the funds provided by Congress were "encumbered" for purposes of § 6672. *Purcell v. United States, supra,* 1 F.3d at 939 (citation omitted); *Barnett v. Internal Revenue Service, supra,* 988 F.2d at 1458 (citations omitted).

 On the record before me, there is no basis for concluding that these funds were "encumbered." Messrs. Mortenson and Fawcett have not shown that Opeleika had a legal obligation to pay its employees, suppliers, and other operating expenses that was superior to its legal obligation to pay employment taxes to the IRS.[5] Although Opeleika may not have received sufficient funding to pay all of its creditors, "a lack of available borrowing does not constitute a lack of unencumbered funds." *United States v. Durham, supra,* 94–2 USTC ¶ 50,331, 1994 WL 421448, at *3 (citing *Purcell v. United States, supra,* 1 F.3d at 938–39).

### Conclusion

The proffered evidence does not negate the plaintiffs' status as "responsible persons" or their willfulness in knowingly paying other creditors in preference to the government. Since the evidence is irrelevant to these determinations, it is inadmissible at trial. FED. R.EVID. 402. The government's motion *in limine* to exclude ¶¶ 17–25 of the Agreed Statement of Facts, except for the first and third sentences of ¶ 23, is granted.

---

**5.** An employee to whom the corporate employer owes wages is merely another creditor in the context of Section 6672. *Hochstein v. United States, supra,* 900 F.2d at 548; *Sorenson v. United States,* 521 F.2d 325, 328 (9th Cir.1975).