**In re Francis B.J. BRANAGAN, JR. and Maureen T. Branagan, Debtors.**

**No. 02–19355bif.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 12, 2006.

Ashely M. Chan, Matthew A. Hamermesh, James M. Matour, Hangley Aronchick Segal & Pudlin, Philadelphia, PA, for Debtors.

## OPINION

BRUCE FOX, Bankruptcy Judge.

Presently before me is an objection by the chapter 11 debtors to an amended unsecured, priority claim filed by the United States, through its agency the Internal Revenue Service. Proof of claim # 27, dated May 5, 2003—which amended an earlier claim filed on January 30, 2003—asserts that the debtors owe the United States $302,115.20. Furthermore, the United States contends that its debt holds priority status pursuant to 11 U.S.C. § 507(a)(8).

As will be discussed, this claim is based upon the failure of a corporation known as Pennsbury Excavating and Landscaping, Inc. ("Pennsbury") to remit to the United States taxes withheld from its employees' wages during the third and fourth quarters of 2001, as well as the employer's social security and medicare tax contributions. The United States maintains that the individual debtors are "responsible persons" within the meaning of 26 U.S.C. § 6672, who willfully failed to tender these so-called "trust fund" taxes, and thus are liable for this employment tax liability. The debtors do not challenge the amount asserted in this claim, nor the priority status of the claim were it allowed; however, they do contest their individual liability as responsible persons. Accordingly, they seek to have the amended claim disallowed in its entirety.

Before considering this objection, I note that on June 27, 2002, Mr. and Mrs. Branagan filed a joint chapter 11 bankruptcy petition under section 302 of the Bankruptcy Code. Although the filing of a joint case by spouses does not, by itself, consolidate their respective bankruptcy estates, *see, e.g., In re Feltman,* 285 B.R. 82, 86 n. 9 (Bankr.D.D.C.2002), on August 4, 2003, the debtors confirmed a joint chapter 11 plan of reorganization. This confirmed plan provided in paragraph 2.3 that all allowed priority tax claims would be repaid in full, with interest, within six years of confirma-

tion (unless the claimant agreed to different terms). The plan does not distinguish between priority tax claims solely against one debtor and claims against both debtors.[1] Accordingly, if either debtor is liable for this tax obligation, it represents a priority claim that must be repaid in full under the binding terms of their joint second amended confirmed plan. 11 U.S.C. § 1141(a). Conversely, if neither debtor is responsible for this claim, then the claim shall be disallowed and need not be paid under the approved plan.

Given the amount of the disputed claim, its potential priority status and entitlement to full repayment under the plan, and given the numerous exhibits and witnesses involved in this objection, the parties elected to treat this dispute as though it were an adversary proceeding for purposes of trial and trial preparation. Extensive discovery was taken, a joint pretrial statement was filed, and evidence was offered over three days of trial. The parties were then afforded ample opportunity to submit post-trial memoranda and proposed findings. All of the admitted evidence has been considered and these submissions have been reviewed.

The debtors' objection to claim # 27 is now ripe for resolution.

### I.

Upon consideration of the testimony and documents offered into evidence, I make the following findings of fact. Because any determination of responsible person liability under section 6672 is, by necessity, factually intensive, these findings are purposefully numerous and detailed:

1. In the 1980s, the husband/debtor, Mr. Francis B.J. Branagan, Jr. (hereinafter "FBII"), started a business called Branagan Builders. He was also involved in various real estate endeavors. 1 N.T. at 37–39.[2] FBII, who was a Wharton School graduate, 1 N.T. at 36, was already a successful businessman when he established Branagan Builders.

2. In the early 1990s, FBII formed an entity called Pennwood Lawn and Garden, which operated a landscaping and maintenance company. *Id.* at 39.

3. In early 1992, the name of the company was changed to Pennsbury Landscaping, Inc. and it was incorporated in Pennsylvania. Ex. PPP, ¶ 2; *see* Ex. Y. Later, the company's focus changed to include commercial excavating, paving and road construction, and it amended its articles of incorporation to rename itself Pennsbury Excavating and Landscaping, Inc. (hereinafter "Pennsbury") in 1994. Ex. PPP, ¶ 3. Pennsbury performed work as a contractor or subcontractor at various projects in southeastern Pennsylvania and southern New Jersey. *Id.* ¶ 4. FBII and wife/debtor, Maureen Branagan, were the sole shareholders of Pennsbury. FBII served as its president. 1 N.T. at 45, 47, 56–7.

4. In the early 1990s, FBII's son, Mr. Francis B.J. Branagan III (hereinafter "FBIII"), and stepson Mr. Robert Callahan, became Pennsbury employees. Ex. PPP, ¶ 8; 1 N.T. at 205. FBIII probably became a corporate vice-president in 1997. Ex. PPP, ¶ 8; 2 N.T. at 61–62.

---

1. Furthermore, the confirmed plan at 6 provided: "Whenever, from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural. . . ."

2. References to Notes of Testimony given on the first day of trial will be designated as "1 N.T. at (page)", while "2 N.T. at (page)" shall refer to testimony given on the second day, and "3 N.T. at (page)" for the testimony given on the third day.

5. Pennsbury's offices, at all times relevant to this dispute, were located at 1442 Bristol Pike, Morrisville, Pennsylvania. Ex. PPP, ¶ 4. At that address were also the offices of Branagan Builders and Morrisville Supply, another company owned by FBII. 1 N.T. at 39–42, 53. This office complex was owned by the debtors: FBII and Mrs. Branagan. *Id.* at 52–53. Pennsbury did not pay rent to the debtors for the use of the office complex. *Id.* at 53.

6. FBII maintained his own office at 1442 Bristol Pike, in the same building as many Pennsbury employees. *Id.* at 41–43, 52. At all times relevant to this contested matter, FBII came into his office on a regular basis. *See id.* at 149.

7. Branagan Builders lent money to Pennsbury on numerous occasions. *Id.* at 44–45, 69, 226. Additionally, Branagan Builders and Pennsbury shared a common employee, Mr. Jay Ferraro, who was paid directly by Pennsbury. Branagan Builders reimbursed Pennsbury for a portion of his wages. *Id.* at 43–44; 3 N.T. at 44–45.

8. FBII served as the president of Pennsbury from its incorporation until 1993, when he resigned. He resigned so he could establish a 401(k) retirement saving account for himself without having to offer that benefit to Pennsbury employees. 1 N.T. at 47–48. FBII continued to serve as a director of Pennsbury until December of 2000. *Id.* at 48.

9. After resigning as president, FBII remained involved with the operations of Pennsbury. Indeed, he acknowledged that "[a]t all times right up to the day the place closed, I assisted Pennsbury in trying to get the business because of my relationship with people in the community." *Id.* at 48.

10. Subsequent to FBII's resignation as president, Mrs. Branagan became president of Pennsbury. *Id.* at 51–52. However, she was president in name only and was not involved in Pennsbury's daily operations. *Id.* at 52, 2 N.T. at 60. Although he was no longer an officer of Pennsbury, FBII continued to exercise many of the functions of the president and chief executive officer of Pennsbury. Ex. PPP, ¶ 7.

11. Although Mrs. Branagan was not involved with company operations, she was present at Pennsbury's offices once or twice per week. When at Pennsbury, she would sometimes sign payroll checks and attend company meetings. Ex. III at 13–14; 1 N.T. at 132, 187; 3 N.T. at 145–46. Mrs. Branagan signed most of the payroll checks that were issued by Pennsbury in the third and fourth quarters of 2001. Exs. MM, NN, LL, KK, JJ, HH, GG, PPP, ¶ 6. Mrs. Branagan, however, did not decide who to pay or how much the payee would receive. 1 N.T. at 131–32; 2 N.T. at 49; 3 N.T. at 157–58.

12. While corporate president, Mrs. Branagan did not review Pennsbury's financial records. 3 N.T. at 161.

13. After FBII resigned as president in 1993, he continued to receive certain benefits from Pennsbury including a car with gasoline reimbursement, health insurance, and reimbursement for business lunches. 1 N.T. at 79–80; 3 N.T. at 88–89. However, he did not receive any salary from Pennsbury. 1 N.T. at 48. Pennsbury also compensated Mrs. Branagan for use of an automobile as well as health insurance. 3 N.T. at 154. During 2000–2001 (and perhaps earlier), she also received annual compensation in the amount of $30,000. Ex. PP; 3 N.T. at 79, 154. The debtors considered this compensation as offsetting Pennsbury's use of the Bristol Pike property without payment of rent. 3 N.T. at 88–89.

14. The debtors acknowledge that they were Pennsbury's sole shareholders until

1999. 1 N.T. at 56–57; 3 N.T. at 69.[3] FBII asserts that in 1999, he and his wife transferred by gift a 20 percent interest in Pennsbury's stock to both FBIII and Mr. Callahan. 1 N.T. at 56–57. Additionally, he contends that in December 2000, they transferred by gift the remaining shares to FBIII and Mr. Callahan, resulting in a 51% interest owned by FBIII and a 49% interest owned by Mr. Callahan. *Id.*

15. However, there was no evidence presented in the form of stock certificates, corporate minutes, or corporate business records, that stock was ever transferred by the debtors to FBIII or Mr. Callahan. Furthermore, FBII never reported such gifts on his federal tax returns. *Id.* at 59–61. He also did not recall ever executing a formal transfer of shares in the corporate stock register. *Id.* at 62–63. In addition, Mrs. Branagan executed a will dated February 28, 2001, which stated in part that she bequeathed 51% of her stock interest in Pennsbury to FBIII and 49% to Mr. Callahan. This bequest would have been unnecessary if those two individuals had already become the sole shareholders of Pennsbury in December 2000.

16. FBIII denies ever receiving Pennsbury shares from the debtors. *Id.* at 220. However, FBIII and Mr. Callahan did sign a voting trust agreement dated September 5, 2001, wherein they are referred to as the sole shareholders of Pennsbury. Ex. D–5; 2 N.T. at 45. It is thus likely that, prior to September 2001, the debtors believed that they had transferred their shareholder interests in Pennsbury to FBIII and Mr. Callahan, but did not actually do so.

17. FBII was authorized to sign checks drawn on Pennsbury's bank account at First County Bank. 3 N.T. at 83–84; *see* 1 N.T. at 64. There was no evidence presented that this authority was ever rescinded, even when FBII ceased being an officer or director. Moreover, both Branagans were authorized to sign checks drawn on Pennsbury's bank accounts during the third and fourth quarters of 2001. Ex. PPP, ¶ 23.

18. At some point in 2001, FBIII became president of Pennsbury at the behest of FBII. 2 N.T. at 63–67. Mrs. Branagan stated that his succession to this position occurred in January 2001. 3 N.T. 145–46. FBIII believes that he became corporate president in April or May 2001. 1 N.T. at 221; 2 N.T. at 63. However, FBIII signed various loan documents dated March 7, 2001 as president of Pennsbury. Ex. D–1. FBIII signed the Premier Bank loan documents in September 5, 2001 as corporate president. Exs. D–3, D–4. Therefore, during the third quarter of 2001 and the beginning of the fourth quarter of 2001, FBIII was Pennsbury's president, and he remained in that position until October 18, 2001.

19. During 2001, FBIII's responsibilities included the management of work crews and field operations. Ex. PPP, ¶ 9. Mr. Callahan's responsibilities primarily involved preparing bids for submission on new projects. *Id.* ¶ 9.

20. During 2001, FBII did not restrict his business activities to Pennsbury. He was the owner of Branagan Builders. *Id.* ¶ 7. He also worked for an entity known as Waste Management of Pennsylvania, Inc., from which he reported income in 2001 of $183,290. Ex. PP, at 1.

21. During 2001, Pennsbury employed several individuals who were involved with the financial affairs of the company, man-

---

**3.** This testimony probably conflicts with the parties' pretrial statement of uncontested fact. Ex. PPP, ¶ 6 ("Beginning in at least 1994, and continuing until 2000, Maureen Branagan … was listed as the president and sole shareholder of Pennsbury.").

aging the accounts payable and accounts receivable, including Ms. Margaret Goodwin and Ms. Geraldine Rush. Ex. PPP, ¶ 10.

22. FBII and FBIII dispute who was actively controlling Pennsbury during 2001. FBII contends that he had no role in the operations of Pennsbury except to assist it in obtaining business contracts. 3 N.T. at 67–69. FBIII maintains that he did not manage employees, except perhaps those at the job sites. *Id.* at 96. The evidence reflects, however, that Ms. Goodwin and other Pennsbury employees reported to FBIII. Nonetheless, Ms. Goodwin, who was employed by Pennsbury between 1991 and 2001, considered FBII as the overall boss. 1 N.T. at 174, 178.

23. Ms. Rush, Pennsbury's office manager and an employee with the company from July 1985 until September 2001, Ex. III at 6, acknowledged that FBIII's role in running Pennsbury's operations increased over time, but that FBII maintained a role in making corporate financial decisions:

> Question: Okay. Mr. Shapiro asked you about Mr. Branagan III becoming more involved in running the company in 2001. And I think your response was he was involved in the managing the company from the whole time he was there, correct?
>
> Answer: That's correct.
>
> Question: Did the nature of his involvement in management change during the time he was there, i.e., did he go from being just a project manager to running the company or being more involved in running the whole company?
>
> Answer: I'm trying to recall. When he was first hired he may have been project manager, as far as his title, but I know that as far as the operations of the company, you know, financial things to jobs, he and his father would at least, you know, discuss those. To the best of my knowledge, there were the things that—
>
> Question: And—
>
> Answer: —Secret from him, you know, or kept from him, as far as operations in the company and running the company. How much leeway he had as far as making the decisions that had to be made. I mean, that may have increased as he became more familiar with it and more experienced.
>
> Question: Is it fair to say that in 2001, Frank Branagan III was running the company on a day-to-day basis?
>
> Answer: He was involved with running the company on a day-to-day basis. In 2001 it seemed like everybody else was involved too, as far as the other officers of the company.
>
> Question: When you say the other officers of the company, who are you talking about?
>
> Answer: And I shouldn't refer to them as other officers because I know, you know, the—at least the officers on paper changed, but Frank Sr., Maureen, Jay, Bob, Frank III. I mean, they all had input as far as the operations and of the running of the company.
>
> I mean, I would dare to say that that's why they had the company meetings. I mean, they were having some problems and they were trying to figure out how to—
>
> Question: Okay.

*Id.* at 53–55.

24. During the third and fourth quarters of 2001, while Ms. Kathyrn Glacken served as corporate controller, she communicated both to FBII and FBIII her con-

clusion that Pennsbury was in very poor financial condition. 1 N.T. at 147–48.

25. This assessment of Pennsbury's condition was corroborated by Ms. Goodwin, who was so upset at constantly fending off demands for payment from suppliers during 2001 that she briefly resigned her position with Pennsbury. *Id.* at 175–76.

26. During 2001, Pennsbury held regular Wednesday meetings to discuss the company's operations, bids, and personnel issues. *Id.* at 68–69, 77, 116–17, 218. These meetings were attended by FBII, Mrs. Branagan, FBIII, Mr. Callahan and several Pennsbury employees. *Id.* at 68–69, 180; 3 N.T. at 51. Everybody was given an opportunity to participate at these meetings. 1 N.T. at 181; 3 N.T. at 51. Ms. Glacken testified that FBIII seemed to be the primary decision-maker at these meetings. 1 N.T. at 118. Mrs. Branagan primarily functioned as a peacemaker between FBII and FBIII. 1 N.T. at 117–18, 121; 3 N.T. at 75, 156–57.

27. Shortly before the closing of Pennsbury's loan with Premier Bank, which occurred in September 2001, there was a Wednesday meeting attended by FBII, FBIII, Mrs. Branagan, and others. At this meeting, it was mentioned that a significant portion of the Premier loan proceeds would be used to repay Pennsbury's delinquent tax obligations for the second and possibly the first quarters of 2001. *Id.* at 218–19.

28. This tax delinquency arose because in 2001, Pennsbury had cash flow problems and repeatedly lacked sufficient funds to meet expenses. Ex. III at 24. Ms. Rush discussed these cash flow difficulties with Ms. Goodwin and FBIII, 1 N.T. at 253, and Pennsbury sought to obtain prompt payment from its obligors. Ex. III at 24, 71; 1 N.T. at 228–29; 2 N.T. at 51. These cash flow problems were also discussed with FBII. Ex. III at 25; 1 N.T. at 250; 2 N.T. at 51. Pennsbury's efforts to meet its payroll obligations during 2001 did not include raising sufficient funds to pay its withholding taxes as they came due. 1 N.T. at 228–29.

29. To raise cash during 2001, FBIII was actively involved in the collection of account receivables, and would negotiate discounts with obligors for early payments. Ex. III at 62; 1 N.T. at 124–25, 250–51. Occasionally during 2001, FBII would also authorize a discount for early payment. Ex. III, at 62; 1 N.T. at 124–25; 250–51.

30. Because of its cash flow problems, Mrs. Branagan lent money to Pennsbury during 2001 on a regular basis to cover its payroll expenses, exclusive of withholding tax obligations. 1 N.T. at 72–73; 3 N.T. at 99–100, 161; *see* 2 N.T. at 51. Pennsbury also borrowed funds from others, including its accountant, John Katsock. Exs. PPP, ¶ 18; D–1. FBII was not always aware of these loans. 3 N.T. at 100–1.

31. For some period of time prior to September 2001, Pennsbury did not make its federal tax deposits until after receiving a letter from the IRS demanding payment. 1 N.T. at 177, 213. On at least one occasion in 2000, FBIII responded to IRS inquiries regarding Pennsbury's past due taxes. Ex. III at 79; 2 N.T. at 23. The evidence reflects that FBIII was aware that no funds were earmarked by Pennsbury to pay withholding taxes whenever the corporation paid its employees during 2001, prior to October 18, 2001. Ex III at 60; 1 N.T. at 228–29.

32. In 2001, Pennsbury determined that it needed additional capital financing. Pennsbury's then existing lender, First County Bank, could not provide this additional financing because of its capital limitations. Ex. PPP, ¶ 14. The decision to seek additional financing involved at least

one meeting attended by FBII, FBIII and Mr. Katsock. 1 N.T. at 73. In the summer of 2001, Pennsbury sought and ultimately obtained a loan commitment from Premier Bank. Ex. PPP at ¶ 14.

33. FBII was involved in the discussions with Premier Bank concerning the amount of the Pennsbury loan and the intended distribution of loan proceeds. 1 N.T. at 213–15. FBIII was involved in collecting financial information for Premier Bank. Ex. III at 81–82. Furthermore, FBIII and Pennsbury's accountant, Mr. Katsock, likely were more involved in meetings with Premier Bank employees than was FBII. 3 N.T. at 106.

34. Pennsbury entered into the Premier Bank loan agreement on September 5, 2001. *See* Exs. D–3; D–4. The financing consisted of a $500,000 line of credit, a $760,000 seven-year loan, and a $1.14 million 20–year loan. Exs. D–3; D–4. This financing package was secured by all of Pennsbury's assets. Ex. PPP; ¶ 15; Ex. D–4 at BR 11339, 11347. The loan agreements were signed on Pennsbury's behalf by FBIII as president and Mr. Callahan as secretary. Ex. D–4; 2 N.T. at 5. The Premier loan agreement was guaranteed by FBII, Mrs. Branagan, FBIII, Mr. Callahan and their respective spouses. *See* Ex. D–4. Among the loan covenants in the security agreement, Pennsbury promised to "promptly pay any and all taxes ... upon the Collateral on the date such taxes ... are due and payable...." Ex. D–4, at BR 11379(5)(C).

35. FBIII was dissatisfied with the terms of the Premier loan because, in his view, it increased Pennsbury's loan obligations without providing it significant additional credit availability. 1 N.T. at 216–18.

36. At the time the Premier loans closed, Pennsbury owed approximately $250,000 in withholding taxes to the IRS.

*Id.* at 103–04. Part of the loan proceeds were used to pay off this tax obligation. Ex. III at 80–81; 1 N.T. at 104, 215. Pennsbury paid the taxes due for the second quarter (and possibly the first) in the amount of $257,111.70 on September 7, 2001. Ex. ZZZ; 1 N.T. at 27. However, the Premier Bank loan proceeds only paid Pennsbury's tax delinquency through the second quarter of 2001 and did not address third quarter obligations. *See* 2 N.T. at 9.

37. Besides paying off Pennsbury's second quarter tax obligation, the Premier Bank proceeds also satisfied a corporate loan obligation, as well as repaid loans made by the Debtors to Pennsbury. 1 N.T. at 215–16. Additionally, $80,000 of the loan proceeds were used to satisfy a Wachovia mortgage on the 1442 Bristol Pike property owned by the Debtors, so that the Premier Bank lien would have first priority. *Id.* at 74–76.

38. In connection with the Premier Bank loan agreement, on September 5, 2001, a voting trust agreement was executed by FBIII and Mr. Callahan as Pennsbury shareholders. Ex. D–5; Ex. PPP, ¶ 16.

39. Pursuant to the terms of this trust agreement, the Debtors were appointed as Trustees. Ex. D–5. In relevant part, the agreement provided:

> Whereas "Pennsbury Excavating and Landscaping, Inc. (the 'Corporation'), is indebted to various financial institutions and The Trustee[s] have jointly and separately guaranteed payment of such indebtedness; and [w]hereas it is the belief of the Shareholders that it will protect the interests of the Trustees and give them comfort by giving them the power to vote all of the outstanding shares."

* * *

"The voting trust hereby created shall continue until the guaranteed debt is paid or Trustees are released from liability. Throughout such period the Trustee[s] shall have the exclusive rights to vote upon such shares or to give written consents in lieu of voting thereon".

Ex. D–5, at 1. By virtue of this agreement, the debtors had the power to exercise complete control over Pennsbury.

40. The debtors insisted upon this voting trust agreement because they were concerned about their liability as guarantors of the Premier Bank loan. 3 N.T. at 111.

41. In September 2001, Pennsbury hired Ms. Glacken to serve as its controller. Ex. PPP, ¶ 12; 1 N.T. at 72. This was the first time that Pennsbury engaged a controller and, like the voting trust, it was a condition imposed by the debtors in return for guaranteeing the Premier Bank loan. 1 N.T. at 72–73.

42. FBII, Mrs. Branagan, FBIII and Mr. Callahan were all present at Ms. Glacken's interview. *Id.* at 72, 115, 230. The decision to extend the offer of employment to her was mutually agreed upon among all of the interview participants. *Id.* at 230. However, it was FBII who called Ms. Glacken to schedule the interview, *Id.* at 72–73, and it was FBII who extended to her Pennsbury's offer of employment. *Id.* at 115. And it was to FBII that she primarily reported. *Id.* at 147–48; 230–31. Through Ms. Glacken, FBII began to exercise greater influence over Pennsbury's financial decisions. *Id.* at 148, 178, 184–85, 230–31.

43. Ms. Glacken believed that she was engaged, at least in part, because FBII wanted FBIII out of the Pennsbury's offices, having concluded that FBIII was better suited to work on the job sites. *Id.* at 148. This belief is consistent with that of Ms. Rush, who observed that in 2001, there was increased oversight of FBIII by FBII and others. Ex. III at 57–58.

44. FBII believed, even prior to the hiring of Ms. Glacken, that he was entitled to receive information regarding Pennsbury's business and financial operations but had difficulty doing so. *See* 3 N.T. at 75–76.

"Frank [FBIII] had a tendency to get explosive if you asked him a question that touched on something which he thought was his privileged information only and I would actually get upset as well, saying, you know, I've got to know what the hell is going on here. You can't just hide everything.... I've been in the business a long time and I have a feeling for something and when I don't get a straight answer from somebody then I know there's something wrong. And I was trying to find out what the heck was, I asked Margaret [Goodwin] a hundred times to see something and she would never do it.... But it got to the point where I was put down at least a dozen times by not being able to get information. I wanted to find out if he made money on a particular job."

*Id.* at 75–77.

45. FBII justified his continued involvement in Pennsbury's business affairs because he and his wife had signed personal guarantees on the promissory notes held both by First County Bank and later by Premier Bank. *Id.* at 77. From FBII's demeanor and overall testimony, I find that his continued involvement with Pennsbury and oversight of FBIII stemmed also from his personality, his lack of complete confidence in FBIII's ability to manage the company successfully, and his sense that any failure by Pennsbury, the compa-

ny he founded, could reflect adversely upon him in the local community.

46. Pennsbury incurred obligations for federal income tax withholding, FICA, and federal unemployment taxes for the third and fourth quarters of 2001. Ex. PPP, at ¶ 5. At the time of the Debtors' bankruptcy filing, Pennsbury still owed $289,163.82 and $69,745.09 for the third and fourth quarters respectively. *See* Exs. QQ, SS. Pennsbury had made no tax deposits for the third quarter of 2001, and made a deposit of only $46,914.63 for the fourth quarter taxes. Ex. XX; 1 N.T. at 20.

47. Ms. Glacken began to realize, almost immediately upon becoming controller in September 2001, that Pennsbury was in poor financial condition. 1 N.T. at 127. Financial records reflecting the company's extensive obligations were prepared, probably by Ms. Glacken or at her direction, in early October 2001. *Id.* at 150. These documents disclosed, *inter alia,* Pennsbury's outstanding third quarter tax liability. Exs. R, VV.

48. On October 17, 2001, at the urging of Mr. Ferraro, 3 N.T. at 49, Ms. Glacken initiated a meeting with FBII and Mrs. Branagan at their home, at which time she informed them of her conclusion that Pennsbury had serious financial problems. 1 N.T. at 88–90; 133–35. Although Ms. Glacken testified that she did not prepare any financial reports especially for this meeting, *Id.* at 150, it is likely that she presented to the debtors previously prepared corporate financial reports on October 17th to support her conclusions regarding Pennsbury's financial difficulties. *See* Finding of Fact # 44; Ex. III, at 19–20 (discussing FBII's repeated requests for financial documents from Ms. Goodwin).

49. Based upon Ms. Glacken's information, the debtors decided to take complete control of Pennsbury's operations. On Oc-

tober 18, 2001, the morning following their meeting with Ms. Glacken, the debtors exercised their rights under the voting trust agreement and removed FBIII and Mr. Callahan from their positions with Pennsbury. *See* Ex. PPP, ¶ 19; Ex. B; 1 N.T. at 70–71, 205. Ms. Goodwin's employment was also terminated. 1 N.T. at 71, 87, 92. On October 18, 2001, FBII became Pennsbury's president. Ex. PPP, ¶ 20. Mrs. Branagan was made secretary of Pennsbury. *Id.* ¶ 25. The debtors also hired the turnaround company of Nachman Hays Brownstein to evaluate the business. *Id.* ¶ 20; 1 N.T. at 71, 90–91; 3 N.T. at 116.

50. The debtors took control of Pennsbury's Premier Bank account after the termination of FBIII. *See* Ex. D; 1 N.T. at 93–94. After October 18, 2001, FBII stopped payment on seven checks drawn on Pennsbury's account. Ex. S; 1 N.T. at 108–9.

51. Prior to October 18, 2001, FBII occasionally signed checks on Pennsbury's behalf, usually when FBIII was not available to do so. Ex. X; 1 N.T. at 109–11; 3 N.T. at 83–85. Mrs. Branagan signed payroll checks, as earlier mentioned. After October 17, 2001, only the debtors signed checks on behalf of Pennsbury. Ex. O, X; 1 N.T. at 82–85.

52. Mrs. Branagan probably was not aware of Pennsbury's unpaid tax liability until December 2001 or early in 2002. 3 N.T. at 168. FBII stated that "I didn't know one way or the other. I never gave it a thought" about whether Pennsbury had been making its withholding tax payments prior to his becoming president on October 18, 2001. 1 N.T. at 97. He also testified that he first became aware of the corporate 2001 tax liability when he received a notice from the IRS in 2002. *Id.*

53. I find that FBII likely knew about Pennsbury's unpaid third quarter 2001 tax liability no later than October 17, 2001, based upon information obtained in his meeting with Ms. Glacken; and he certainly knew of this obligation by October 31, 2001. On that later date, FBII signed Pennsbury's third quarter tax return. Ex. PPP, ¶ 24; Ex. F; 1 N.T. at 98, 116. The tax return disclosed that Pennsbury owed $289,163.92 to the IRS and that no deposits had been made for that quarter. Ex. F; 1 N.T. at 99.

54. Ms. Glacken prepared this quarterly tax return. When she gave it to FBII for his signature, she told him of the unpaid corporate tax liabilities. 1 N.T. at 116–18. Under federal law, Pennsbury's third quarter corporate withholding tax obligations were payable on October 31, 2001. *See* 26 C.F.R. §§ 31:6151(a), 31:6071(a)–1. Given FBII's extensive business background and the comments to him by Ms. Glacken, he was likely aware that the tax obligation, as well as the tax return, were due on October 31, 2001.

55. FBII testified that he did not read the tax return when he signed it and he was unaware that the taxes had not been paid at that time. 1 N.T. at 98. This testimony is not credible. FBII was a Wharton graduate, a successful business person, and a prior manager of numerous companies, including Pennsbury. He knew that Pennsbury's second quarter tax payments had only been made as a result of the Premier loan. He also knew of the company's severe cash flow problems and extensive liabilities, which were his justifications for exercising the voting trust. And he had probably been shown financial reports by Ms. Glacken at the October 17, 2001 meeting, which reports would have revealed the tax delinquency.

56. Pennsbury continued to operate for only a short period of time after FBII assumed complete control of Pennsbury on October 18, 2001. 3 N.T. at 117. During this brief period of operations, "[b]etween October 18, 2001 and November 16, 2001, Pennsbury employees and certain creditors of the company were paid. The last of Pennsbury's payroll checks that were honored by Premier Bank were payroll checks issued November 16, 2001." Ex. PPP, ¶ 21.

57. Pennsbury paid at least some of its withholding taxes that came due on or after October 18, 2001. Ex. G.

58. FBII and FBIII have not spoken since October 18, 2001. 1 N.T. at 232. FBII blamed FBIII for the financial collapse of Pennsbury, *Id.* at 233; 3 N.T. at 116–7.

59. FBII signed Pennsbury's fourth quarter 2001 tax returns on March 17, 2003, showing a balance due for that quarter of $83,034.20. Ex. PPP, ¶ 24; Ex. G.

60. The balance in Pennsbury's First County Bank account on October 17, 2001 was $58,656.69 and was reduced to $10,585.13 on October 31. Ex. I at BR 08696; BR 08698.

61. The balance in Pennsbury's Premier Bank checking account on October 17, 2001 was $253,778.83. By November 1, 2001 this amount increased to $374,795.83. Exs. H, X at BR 03635. Therefore, Pennsbury had sufficient funds to repay its third and fourth quarter tax obligations on the date FBII became aware of the tax delinquency.

62. Pennsbury's borrowing base certificate states that the corporation had $1,555,193 in outstanding account receivables on October 31, 2001, of which $786,496 were less than 90 days old. Ex. M. Additionally, a Pennsbury balance sheet dated November 7, 2001, shows than on October 31, 2001 Pennsbury held more than $1.4 million in cash and receivables,

and had tax liabilities of more than $700,000. Ex. UU.

63. Pennsbury deposited $72,014.56 into its Premier Bank account during November 2001 and withdrew $429,705.15. Ex. H.

64. On November 5, 2001, FBII authorized the transfer of $70,000 from a Pennsbury bank account to Branagan Builders by wire transfer. Exs. H; Q. This payment was to replace a $60,000 check dated October 1, 2001 to Branagan Builders that was returned for insufficient funds. Ex. P; 1 N.T. at 105–06.

65. On November 14, 2001, Premier Bank executed a "principal reduction or line of credit 7208424–50005" in the amount of $93,339.64. Ex. O at 0174. Similarly, $17,105.24 was withdrawn by Premier on December 12, 2001. *Id.* at 0209. There was no evidence offered that Premier Bank issued a notice of default on its loan prior to December 2001.

66. After the company ceased operations, many of Pennsbury's assets were auctioned, with the proceeds used to pay down the Premier Bank loan. 3 N.T. at 118. There was no evidence presented as to the amount of such proceeds. The book value of Pennsbury's equipment, as of October 31, 2001, was more than $3 million. Ex. UU. FBII was more concerned with repaying Premier Bank, for whom he had guaranteed payment, than the withholding tax liability, for which he probably assumed FBIII would be responsible.

67. During the third quarter of 2001, Pennsbury failed to remit $219,080.63 of employee income, social security and medicare taxes that were due. Ex. PPP, ¶ 28.

68. During the fourth quarter of 2001, Pennsbury failed to remit $83,034.57 of employee income, social security and medicare taxes that were due. *Id.* ¶ 28.

69. The debtors received an IRS notice of a proposed tax assessment, based upon Pennsbury's tax liability, and did not file any protest. 2 N.T. at 121–22. On November 10, 2003, the IRS assessed corporate tax liability against the debtors in the amount of $219,080.63 and $83,034.57 for the third and fourth quarters of 2001 respectively. Exs. LLL, MMM, NNN, OOO; 2 N.T. at 123–29.

70. On June 27, 2002, the debtors filed their joint voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Ex. PPP, ¶ 1. The second amended joint chapter 11 plan was confirmed on August 4, 2003.

71. The United States filed an amended priority proof of claim, docketed as claim # 27, which claim superceded its earlier claim and which asserted that the debtors were responsible persons under 26 U.S.C. § 6672 for Pennsbury's unpaid withholding taxes in the third and fourth quarters of 2001. *Id.* ¶ 30.

72. The debtors filed an objection to this claim, asserting that neither of them was a responsible person under section 6672.

73. Although FBIII was sent a notice of proposed assessment by the IRS, the IRS ultimately decided not to assert responsible person liability against him. 1 N.T. at 237. Thus, underlying this proof of claim dispute is the debtors' belief that FBIII, and not they, should be held liable for Pennsbury's unpaid withholding tax obligations.

II.

I reach the following legal conclusions:

1. The debtor, FBII, was a responsible person during the third and fourth quarters of 2001, pursuant to 26 U.S.C. § 6672.

2. FBII did willfully fail to pay over the unpaid taxes to the IRS after October 18, 2001.

3. Because FBII was a responsible person throughout the third and fourth quarters of 2001, he had a duty to pay over all existing and after-acquired funds from the date he had knowledge of the unpaid taxes, which date was likely October 17, 2001 and certainly October 31, 2001.

4. Alternatively, Pennsbury had sufficient unencumbered funds to meet its corporate tax liabilities that were payable after October 17, 2001, and FBII was in control of those funds as of October 18, 2001 and knew of the tax delinquency on or prior to the date that the obligation was due. Therefore, his failure to pay the IRS debt of the third quarter of 2001, and later for the fourth quarter of 2001, render him liable.

### III.

In order to adjudicate this claims objection, I shall first consider the parties' respective evidentiary burdens of proof. The debtors assert that the burden of persuasion regarding their liability rests with the IRS, since it is the proponent of the claim. The United States contends that the debtors have the burden to demonstrate that the tax assessment against them was erroneous. *See* Joint Pretrial Statement V(B).

■■■■ In general, the Third Circuit Court of Appeals has decided that a shifting evidentiary burden arises in claims objections. *In re Allegheny International, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). An initial burden rests on the claimant to allege sufficient facts to support its claim. *Id.* at 173. Then the burden of production shifts to the objector to "produce evidence sufficient to negate the prima facie validity of the filed claim." *Id.* If that burden of production is met, then the burden of persuasion falls upon the claimant to demonstrate the validity of the claim by the preponderance of the evidence. *Id.* at 174.

■■■■ The typical allocation of evidentiary burdens in bankruptcy cases differs from burden allocation in a tax dispute that arises in a non-bankruptcy context. In a non-bankruptcy forum, once the IRS has introduced a certification of a tax assessment, the assessment carries a rebuttable presumption of correctness (unless the taxpayer falls within a narrow exception), placing the burden of persuasion upon the taxpayer. *See Neonatology Associates, P.A. v. Commissioner,* 299 F.3d 221, 227 (3d Cir.2002); *Francisco v. United States,* 267 F.3d 303, 319 (3d Cir.2001); *Psaty v. United States,* 442 F.2d 1154, 1159 (3d Cir.1971) (the taxpayer has the burden of proof). Although 26 U.S.C.A. § 6672, the applicable statute in this dispute, is described as a 100% penalty for responsible persons, in reality it functions like a tax, and the taxpayer challenging the liability assessment has the burden of proof. *See Brounstein v. United States,* 979 F.2d 952, 954 (3d Cir.1992); *In the Matter of Ribs–R–Us, Inc.* 828 F.2d 199, 200–01 (3d Cir.1987). As explained by the Third Circuit Court of Appeals:

> Section 6672(a) provides that a person responsible for withholding and paying over taxes who willfully fails to do so is liable for a penalty equal to the total amount of the unpaid taxes. A section 6672 assessment against a responsible person is equivalent to the assessment of a tax. 26 U.S.C.A. § 6671(a) (West 1989).... Once the IRS assesses a tax, a rebuttable presumption arises that the assessment is correct.... Thus, the IRS's introduction of certified copies of the assessment before the district court shifted to Brounstein the burden of going forward with evidence to show that

the assessment against him under section 6672 was incorrect by establishing either (1) that he was not a responsible person within the meaning of the statute, or (2) that he did not willfully fail to pay the amount due to the IRS. *Brounstein v. United States,* 979 F.2d at 954 (footnote and citations omitted).

Given this difference between the allocation of evidentiary burdens typically assigned in bankruptcy proof of claim disputes and in non-bankruptcy taxpayer contests, courts disagreed whether the bankruptcy or non-bankruptcy model applied when an IRS proof of claim was challenged. That disagreement was resolved by the United States Supreme Court, which held "that in the absence of modification expressed in the Bankruptcy Code the burden of proof on a tax claim in bankruptcy remains where the substantive tax law puts it." *Raleigh v. Illinois Dep't of Revenue,* 530 U.S. 15, 26, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) (the burden of persuasion with respect to corporate officer's tax liability, as a responsible person for unpaid taxes due to a state government, was not altered by the officer's bankruptcy filing).

As noted earlier, once the Commissioner of Internal Revenue has made a tax assessment against a taxpayer "[h]is ruling has the support of a presumption of correctness, and the petitioner has the burden of proving it to be wrong." *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933); *see, e.g., Brounstein v. United States,* 979 F.2d at 954; *Sullivan v. United States,* 618 F.2d 1001, 1008 (3d Cir.1980). In other words, the taxpayer

must demonstrate that the assessment was erroneous. *Francisco v. United States,* 267 F.3d at 319; *In the Matter of Resyn Corp.,* 851 F.2d 660, 663 (3d Cir.1988); *Demkowicz v. Commissioner,* 551 F.2d 929, 931 (3d Cir.1977); Corrine Lynn Lyle, Note *The Wrath of I.R.C. § 6672: The Renewed Call For Change—Is Anyone Listening? If You Are A Corporate Official, You Had Better Be,* 74 S. Cal. L.Rev. 1133, 1147–48 (2001).[4]

■ Therefore the debtors bear the burden of persuasion to prove that the assessment of responsible person liability against them was erroneous. *See Raleigh v. Illinois Dep't of Revenue,* 530 U.S. at 26, 120 S.Ct. 1951.

## IV.

### A.

"Employers are required to deduct from employee wages—and turn over to the Internal Revenue Service—social security, Medicare and federal income taxes. Although the primary liability for failing to do so is the employer's, a penalty for such a failure equal to the unpaid tax can be collected from '[a]ny person' who was 'required' but 'willfully' failed to pay over the withheld taxes." *Lubetzky v. United States,* 393 F.3d 76, 78 (1st Cir.2004). Employers hold such deductions in trust until the quarterly payment to the IRS is due. 26 U.S.C.A. §§ 3401–3402. "Under § 7501(a), the withheld taxes are 'held to be a special fund in trust for the United States.'" *United States v. Mitchell,* 82 Fed.Appx. 781, 784 (3d Cir.2003) (quoting

---

4. This allocation of the burden of persuasion was significantly altered by legislation enacted by Congress in 1998 and codified at 26 U.S.C. § 7491. However, this recent statutory provision clearly states that it is only "relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B." 26

U.S.C. § 7491(a)(1). Section 6672 is not contained in either subtitle A or B, but instead in subtitle F of the Internal Revenue Code and therefore is not governed by the 1998 legislation. *See Collier on Bankruptcy Taxation* ¶ 5.03 (15th ed. rev.2005).

*Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)).

Employers are required to collect and withhold these taxes at the same time that wages are paid to their employees, but need only pay the taxes to the IRS on a quarterly basis. As a result, "the funds accumulated during the quarter can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov v. United States,* 436 U.S. at 243, 98 S.Ct. 1778. "Because the withholding tax fund seems to be a ready source of cash, financially strapped firms find it a very attractive source of funds to use for operating expenses. Corporate officers often attempt to 'borrow' from the trust fund taxes to help stave off other creditors and remain in business." Lyle *supra* at 1134–35 (footnote omitted).

The evidence is undisputed that Pennsbury did not remit all of the trust fund taxes it was obligated to collect and withhold in 2001. Rather, due to cash flow problems, it essentially used those withheld funds to pay other obligations. As just mentioned, when that occurs, certain individuals can be held personally liable for this corporate obligation.

■ 26 U.S.C.A. § 6672 provides: "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax" shall be liable for a penalty equal to one hundred percent of the taxes due.[5] The statute therefore establishes two general requirements for personal liability for unpaid corporate trust fund taxes. First, a court must determine whether a particular individual is a "responsible person." Second, a court must analyze if that person's failure to collect and pay over the requisite taxes was willful. *See, e.g., Brounstein v. United States,* 979 F.2d at 954; *Quattrone Accountants, Inc. v. IRS.,* 895 F.2d 921, 927 (3d Cir.1990).

Given the previously discussed allocation of the evidentiary burdens, I will consider whether the debtors have demonstrated that either of the statutory components of liability is absent. As noted earlier, however, their jointly confirmed chapter 11 plan requires payment in full to the IRS if either debtor is held liable.

**B.**

■ Responsible persons, under 26 U.S.C.A. § 6672, are obligated to collect, account for or pay over taxes to the IRS. An individual need not engage in all three of the activities listed in the statute in order to be held liable; involvement in any one of the three activities is sufficient. *Slodov v. United States,* 436 U.S. at 250, 98 S.Ct. 1778. "Responsibility is a matter of status, duty or authority, not knowledge." *Quattrone Accountants, Inc. v. I.R.S.,* 895 F.2d at 927. Indeed, "[t]he concept of 'responsibility' has been con-

---

5. One commentator explained the policy concerns behind section 6672:

> The IRS needs these funds because employees are still credited with the payment [of the withheld taxes] and the government is therefore obligated to pay these amounts to eligible recipients. Withholding taxes are not simply a debt, but are actual wages of the employee held in trust by the employer for the government. The government has to pay the employee regardless of whether the government actually receives the corresponding funds from the corporation. Therefore, to ensure that employees receive their social security benefits, the government has to use other funds as subsidies to the extent that withholding taxes are not collected. Consequently, many programs may be lacking funds because those funds are being used to cover the missing withholding funds owed by corporations.

Lyle, *supra,* at 1138 (footnotes omitted).

strued broadly by the courts." *Lyle, supra,* at 1140.

In determining whether an individual should be considered a responsible person under section 6672, courts have considered the following non-exclusive factors:

(1) contents of the corporate bylaws,

(2) ability to sign checks on the company's bank account,

(3) signature on the employer's federal quarterly and other tax returns,

(4) payment of other creditors in lieu of the United States,

(5) identity of officers, directors, and principal stockholders in the firm,

(6) identity of individuals in charge of hiring and discharging employees, and

(7) identity of individuals in charge of the firm's financial affairs.

*Brounstein v. United States,* 979 F.2d at 954–55. In general, "[i]ndicia of responsibility includes the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire employees. It is undisputed that more than one person may be a responsible officer of the corporation under § 6672." *Thibodeau v. United States,* 828 F.2d 1499, 1503 (11th Cir.1987); *see, e.g., Brown v. United States,* 591 F.2d 1136, 1138 (5th Cir.1979).

It is important to observe that an individual may be held responsible even if he does not satisfy all of the factors just noted. *See In re Treacy,* 255 B.R. 656, 663 (Bankr.E.D.Pa.2000) ("The question of control over the employer's finances must be answered in light of the totality of the circumstances; no single factor, or the absence thereof is determinative.").

Typically, § 6672 litigation involves corporate officers and high ranking employees. *See, e.g., Greenberg v. United States,* 46 F.3d 239 (3d Cir.1994); *Brounstein v. United States,* 979 F.2d at 953; *Datlof v. United States,* 252 F.Supp. 11 (E.D.Pa.), *aff'd* 370 F.2d 655 (3d Cir.1966). However, responsible person liability is not restricted to corporate officers and directors. *See Quattrone Accountants, Inc. v. IRS,* 895 F.2d at 927 (responsible person need not be a corporate officer or director). Indeed, it is not necessary for a person to be an employee or an officer, or to hold any formal position with the corporation, to be held responsible for corporate withholding liability. *See Quattrone Accountants, Inc. v. IRS,* 895 F.2d at 927 (outside accounting firm is a responsible person); *McDermitt v. United States,* 954 F.2d 1245 (6th Cir.1992) (outsider that was actively involved in the company's operations held liable); *United States v. Vespe,* 868 F.2d 1328,1332 (3d Cir.1989) (president of several related companies was responsible); *Merchants National Bank v. United States,* 878 F.2d 1382 (11th Cir.1989) (bank held to be a responsible person); *Purdy Co. of Illinois v. United States,* 814 F.2d 1183 (7th Cir.1987) (creditor is a responsible person); *Caterino v. United States,* 794 F.2d 1, 6 (1st Cir.1986) (lender is a responsible person); *Commonwealth National Bank v. United States,* 665 F.2d 743 (5th Cir.1982) (bank and bank's chief executive officer were found responsible).

Liability under section 6672 will not be imposed unless an individual has some "significant, though not necessarily exclusive, control over the employer's finances." *United States v. Vespe,* 868 F.2d at 1332; *see Brounstein v. United States,* 979 F.2d at 954. For example, "[a] person has significant control if he has the final or significant word over which bills or creditors get paid." *Quattrone Accountants, Inc. v. IRS,* 895 F.2d at 927; *see Cutaiar v. United States,* 1992 WL 198927, at *7

(E.D.Pa.1992) ("A person may be responsible even though he does not exercise day-to-day control of the finances as long as he has the right to control them.").

■ Moreover, I am aware that an individual's "[r]esponsibility during one [tax] period does not equate to responsibility in all [tax] periods." *Vinick v. United States,* 205 F.3d 1, 11 (1st Cir.2000). When different quarterly payments are involved, courts must analyze an individual's responsibility for each quarter separately. *Id.; see generally Kenagy v. United States,* 942 F.2d 459 (8th Cir.1991); *Caterino v. United States,* 794 F.2d at 4 ("Caterino's involvement with Northerlin was insufficient to make him 'responsible' for 1973 under section 6672, but was sufficient to make him 'responsible' for the first two quarters of 1974."). Pennsbury had unpaid withholding taxes for both the third and fourth quarters of 2001. Exs. LLL, MMM, NNN, OOO; 2 N.T. at 123–29. Therefore, the relevant inquiry is whether either debtor was a responsible person in each of those quarters.

I shall begin with analyzing the liability of FBII, the husband/debtor. Clearly, his involvement with Pennsbury was more extensive than Mrs. Branagan's. And if he is found liable, I need not proceed further.

## C.

■ The debtors and the IRS agree that on October 18, 2001, FBIII was no longer an officer or employee with Pennsbury and FBII was installed as Pennsbury's president, whereupon he assumed complete control of corporate operations and finances. Indeed, the debtors concede that FBII was a responsible person for the fourth quarter tax liability incurred on or after October 18, 2001. Debtors' Post–Trial Brief at 7 n. 1. They dispute, however, that FBII was a responsible person for the third quarter of 2001, and the earlier portion of the fourth quarter.[6]

The debtors maintain that FBIII was in control of the operations of Pennsbury prior to October 18, 2001, and was its corporate president. In their view, if any individual is responsible for the unpaid corporate tax liability, it is he. However, more than one individual can be responsible for the unpaid withholding taxes of a corporation for a given period. *United States v. Vespe,* 868 F.2d at 1335; *Mahler v. United States,* 121 F.Supp.2d 179, 184 (D.Conn.2000) ("Significant control may

---

**6.** The debtors' concession-that FBII was a responsible person as of October 18, 2001—is more significant than they realize. As will be discussed in more detail, even if he were not a responsible person before that date, his duty to pay over the third quarter taxes due which were due on October 31, 2001 is sufficient to render him responsible for the entire third quarter.

The third quarter for withholding taxes had ended on September 30, 2001, but the quarterly tax return and deposit of tax funds was not due for 31 days. *See* 26 C.F.R. §§ 31.6011(a)–4(a), 31.6071(a)–1(a), 31.6151–1; 13 *Mertens Law of Fed. Income Taxation* § 47A:43 (2005). Responsible persons under 26 U.S.C.A. § 6672 are required to collect, account for *or* pay over taxes to the IRS. *See Slodov v. United States,* 436 U.S. at 250, 98

S.Ct. 1778 (1978). Thus, the duty to pay alone suffices to make a person responsible for the entire quarter. Pennsbury's third quarter tax liability was not payable until October 31, 2001–after FBII seized control. *See, e.g., Brown v. United States,* 591 F.2d at 1140 ("Brown, who assumed control on April 10, was under a duty to pay over the first quarter withholding taxes and was, therefore, a responsible person for Sibwin during the first quarter."); *Wetzel v. United States,* 802 F.Supp. 1451, 1462 n. 6 (S.D.Miss.1992) ("Because Wetzel became a responsible person prior to the time that the 1986 last-quarter taxes were due to be paid (i.e., January 31, 1987), it was his duty as a responsible person to pay over such taxes."); *Blackburn v. United States,* 1980 WL 4717, at *10 (Ct.Cl.1980).

also be shared by several people within a company, all of whom may be found liable for a withholding tax delinquency."). The IRS contends that FBII had sufficient influence and control of Pennsbury's financial affairs prior to October 18, 2001 to warrant responsible-party status under section 6672.

▮ FBII counters that any involvement he had with Pennsbury prior to becoming president on October 18th was limited, and was necessitated by his and his wife's guarantees of Pennsbury's loan agreements with First County Bank and later with Premier Bank. Debtors' Conclusions of Law ¶ 22. Actually, the evidence suggests additional factors that gave rise to FBII's continued, significant role with Pennsbury. Moreover, section 6672 is concerned with the extent of FBII's involvement. The reasons an individual may choose to obtain and exert control are immaterial, except as they help explicate the nature of that control.

The fact that FBII held no formal position as officer or director of Pennsbury in 2001, before October 18th, is not dispositive. *See Mahler v. United States*, 121 F.Supp.2d at 194 (an individual who was neither a shareholder nor officer of the corporation was held to be liable under section 6672). Indeed, the evidence is undisputed that he remained in significant (if not complete) control of Pennsbury for years after giving up his officership position with the corporation in 1993, while Mrs. Branagan was nominally president, and prior to making his son and stepson corporate officers. Obviously, he would have been a responsible person for tax liability purposes during that period, not because he remained a director, but because he exercised continued control over corporate affairs.

After FBIII and Mr. Callahan became officers, the evidence demonstrates that FBII reduced his influence over Pennsbury, but still remained involved in Pennsbury's operation. Gradually, FBIII took control of the corporate day-to-day operations, such as overseeing the work at the job sites. However, FBII was still seeking financial information, still striving to obtain business for the corporation, still maintaining his office in the same location as Pennsbury, and still helping the corporation financially, as needed.

I agree that FBII hoped that Pennsbury, under the leadership of his son and stepson, would continue to prosper and grow. But the evidence does not support his suggestion that he turned the company he founded over to FBIII and became only an interested observer of corporate affairs: an "elder statesman for the company ... counseling employees on occasion." Debtors' Post–Trial Brief, at 9. He was an active, successful businessman, with numerous business connections and a strong personality. He was Pennsbury's founder and *de facto* lessor. He elected to maintain his office in the same location as Pennsbury's offices. He was a guarantor of company loans, as well as a creditor of Pennsbury, either individually or through Branagan Builders. Moreover, FBII had been connected with Pennsbury for so long, he seemed to feel that the company's success, or lack thereof, reflected upon him.

From my evaluation of the witnesses and evidence presented, I conclude that FBII did not have the personality, nor the complete confidence in FBIII, to become a merely passive observer of Pennsbury's affairs, offering advice only when consulted. Indeed, to various Pennsbury's employees, such as the long-time office manager, while FBIII was a boss, FBII remained the ultimate boss.

In 2001, his involvement in Pennsbury increased as its financial affairs became more problematic and its cash-flow needs more pronounced. He attended regular meetings, where he clashed with FBIII (thus necessitating Mrs. Branagan's role as peacemaker). He sought financial information about the company. He played a role in directing the distribution of funds from the Premier Bank corporate loan in September 2001. He also insisted on a voting trust that would allow him (and Mrs. Branagan, who was willing to defer to his expertise) to exercise complete control at any time that the Premier loan guarantee was outstanding. And he required and actively participated in the hiring of Pennsbury's controller: arranging the interview, attending it and extending the job offer. Through the controller, who reported to him, FBII was able to learn more about Pennsbury's financial affairs and could exercise greater influence over its operations. Moreover, the controller was given the impression by FBII that she was hired to reduce FBIII's role in the financial management of Pennsbury's affairs. That reduction would be commensurate with FBII's increased influence.

The evidence also reflects that throughout 2001, FBII was an authorized signator on Pennsbury's corporate bank accounts, and signed several corporate checks even prior to October 18, 2001. Moreover, he attended and participated in weekly meetings throughout 2001, where Pennsbury's business operations were discussed and decisions were made.

On October 17, 2001, he met with Pennsbury's controller and received information that persuaded him that the financial problems of Pennsbury warranted his complete control, and so he simply exercised his rights under the previously signed voting trust. FBIII obviously was not involved in that decision. Thereafter, FBII signed the third and fourth quarter 2001 withholding tax returns for Pennsbury. In addition, FBII determined which corporate creditors would be paid after October 17, 2001.

If FBII had demanded, even prior to October 18, 2001, that withholding taxes be collected and withheld, he had a number of options with which to enforce his demand. He had signatory authority of Pennsbury's accounts and could write a check; he could include such funds in any loans made by his wife (or by Branagan Builders) to Pennsbury to meet payroll, and condition the loan upon proof of payment; or he could exercise his powers under the voting trust and oust FBIII and Mr. Callahan.

As mentioned in footnote 6 above, the debtors' acknowledgment that FBII was a responsible person as of October 18, 2001 is enough to render him responsible under section 6672 for the third and fourth quarter employment taxes. The third quarter payment was not due until October 31, 2001. But in the interest of completeness, I conclude that the evidence also demonstrates that for the third and fourth quarters of 2001: FBII had the ability to spend corporate funds; he signed quarterly corporate tax returns; he attended weekly "management" meetings; he arranged for payment to certain corporate creditors; he exercised his right to become corporate president in the fourth quarter and then fired various corporate officers and employees; he was perceived by at least some (if not all) employees as the ultimate boss; he received financial information from the corporate controller; and he increased his influence over corporate affairs until he ultimately asserted complete control of all affairs, utilizing a document executed during the third quarter.

Based upon this evidence, FBII did not meet his burden to demonstrate that IRS's determination that he was a "responsible

person" for the unpaid third and fourth quarter employment taxes was erroneous. *See Mahler v. United States,* 121 F.Supp.2d at 194 (father of corporate vice-president and husband of president, who was corporate consultant, was held responsible for corporate withholding tax liabilities). *Compare Williams v. United States,* 25 Cl.Ct. 682 (1992) (son, who was corporate officer and office manager, held not responsible person under § 6672, where evidence disclosed that his father actually controlled the corporate finances).

### D.

▮ Since I have found FBII to be a responsible person, I must also determine if he willfully failed to pay over the taxes. Willfulness, in the context of section 6672, has been defined by the Third Circuit as "a voluntary, conscious and intentional decision to prefer other creditors over the Government." *Quattrone Accountants, Inc. v. IRS,* 895 F.2d at 928. A person need not have acted with an intent to defraud the IRS in order for his conduct to be willful. *Bell v. United States,* 355 F.3d 387, 393 (6th Cir.2004); *see Honey v. United States,* 963 F.2d 1083, 1087 (8th Cir.1992) (a party does not have show bad or evil motive in order to prove willfulness). "A responsible person acts willfully when he pays other creditors in preference to the IRS knowing that taxes are due, or with reckless disregard for whether taxes have been paid." *Brounstein v. United States,* 979 F.2d at 956; *see United States v. Carrigan,* 31 F.3d 130, 134 (3d Cir.1994); *United States v. Vespe,* 868 F.2d at 1335. Thus, the Third Circuit has observed:

> Willfulness also encompasses the payment of other creditors with reckless disregard for whether taxes have been paid. *Sawyer v. United States,* 831 F.2d 755, 758 (7th Cir.1987). This standard is satisfied if the taxpayer " '(1) clearly ought to have known that (2) there was

a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily.' " *Id.* (quoting *Wright v. United States,* 809 F.2d 425, 427 (7th Cir.1987)). Vespe's subsequent preference of other creditors to the government when he should have known of the past delinquency will subject him to liability.

*United States v. Vespe,* 868 F.2d at 1335. An example of reckless disregard is the "failure to investigate or correct mismanagement after being notified that withholding taxes have not been paid." *Greenberg v. United States,* 46 F.3d at 244; *see also Lyle, supra,* at 1144:

> The current definition of willfulness under § 6672 is more relaxed than is the definition used for other violations of the tax code. The courts have construed "willfulness" under § 6672 to mean the "voluntary, conscious and intentional act" of paying creditors other than the IRS when the company is financially troubled. No evil motive or fraudulent purpose is necessary to satisfy the willfulness prong. The government is not required to prove that the responsible person deliberately sought to defraud the government. If a person deemed responsible discovers the existence of unpaid taxes, the responsible person has an immediate duty to use all unencumbered funds to pay the taxes. If the responsible person fails to pay the back taxes, that person becomes liable for the unpaid withholding taxes. The Ninth Circuit has realized the potentially harsh consequences of the current interpretation of willfulness: "Undoubtedly, the standard is a harsh, even somewhat counterintuitive one, but it is the law."

(quoting *Buffalow v. United States,* 109 F.3d 570, 573 (9th Cir.1997)) (footnotes omitted).

■ A responsible person, however, cannot act willfully without knowledge of a corporation's withholding tax delinquency. In this contested matter, the evidence revealed that FBII was aware of Pennsbury's tax liability certainly by October 31, 2001 and probably by October 17, 2001.

■ Before I address FBII's specific knowledge, I note that he knew that Pennsbury had not paid second quarter taxes until it obtained the Premier loan proceeds in early September 2001 approximately one month after they were due. I appreciate that knowledge of past withholding tax delinquencies does not necessarily demonstrate knowledge of a delinquency in a subsequent quarter. *See Gustin v. United States*, 876 F.2d 485 (5th Cir.1989); *Wright v. United States*, 809 F.2d at 428. However, FBII also knew from the company controller on October 17, 2001 that Pennsbury continued to have severe cash flow problems immediately after the Premier loan closing. *See also Stevenson v. Tax Commission*, 112 P.3d 1232, 1236 (Utah Ct.App.2005) ("Generally, for a risk of nonpayment to be obvious, the company must have had a history of failing to pay taxes that would place the responsible party on notice.").

The evidence also reveals that FBII met with the corporate controller on October 17, 2001. Financial records had been prepared in early October 2001, which clearly revealed Pennsbury's extensive tax liabilities. Given FBII's experience and previous demand for financial information from Pennsbury's employees, and given that the purpose of the meeting was to convey to FBII the dire financial condition of the company, it is likely that Ms. Glacken disclosed to FBII Pennsbury's extensive liabilities, including tax obligations.

Third, on October 31, 2001, FBII signed Pennsbury's third quarter federal tax return which clearly states that $289,163.92 was then due. And as FBII was in complete control of all corporate funds at that time, he obviously knew that no payments were made in connection with this return. While FBII denies that he read the tax return he signed, Ms. Glacken testified credibly that she made him aware that the taxes were due at this time. *See In re Premo*, 116 B.R. 515, 532 (Bankr. E.D.Mich.1990) ("It is also clear that knowledge of the delinquency can be established by circumstantial evidence; the factfinder is not bound to accept self-serving statements by the would-be penalty payer as to what he did or did not know regarding the status of tax payments owing to the Government.").

As a result, FBII clearly had actual knowledge of the unpaid taxes on October 31, 2001, he probably knew of Pennsbury tax delinquency on October 17, 2001, and he knew or should have been aware as of October 17th that there was a grave risk that withholding taxes were not being paid. Additionally, due to his position as president of Pennsbury on October 18, 2001, he could very easily have learned the extent of any tax liabilities.

■ I appreciate that FBII's knowledge about Pennsbury's third quarter tax delinquency arises from the disposition of the Premier loan proceeds in September 2001, from information conveyed to him by the controller in October 2001, and from the tax return signed by him on October 31, 2001. All three sources arose after the third quarter began in July 2001, and two occurred after the quarter ended on September 30, 2001. Moreover, during that entire quarterly period, FBIII was corporate president and was largely in charge of Pennsbury's day-to-day affairs. A court should not readily impose liability upon an individual for a corporate employment tax delinquency that arose prior to his knowledge of the obligation, especially when,

upon his first learning of the liability, the corporation has insufficient funds to pay the tax debt.

The United States Supreme Court, in *Slodov v. United States*, considered the liability of a purchaser of businesses that were delinquent in tendering their federal withholding tax payments. 436 U.S. at 241, 98 S.Ct. 1778. The seller had represented to the buyer that the corporations had sufficient assets to pay these taxes, as well as other outstanding bills, but this turned out not to be true. *Id.* at 241–42, 98 S.Ct. 1778. The Court found "at the time that [the purchaser] assumed control, the corporations had no liquid assets, and whatever trust-fund taxes had been collected prior to [purchaser's] assumption of control had been dissipated." *Id.* at 242, 98 S.Ct. 1778. Under those circumstances, the Court held:

> that a "responsible person" under § 6672 may violate the "pay over" requirement of that statute by willfully failing to pay over trust funds collected prior to his accession to control when at the time he assumed control the corporation has funds impressed with a trust under § 7501, but that § 7501 does not impress a trust on after-acquired funds, and that the responsible person consequently does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States when at the time he assumed control there were no funds with which to satisfy the tax obligation and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

*Id.* at 259–260, 98 S.Ct. 1778.

The *Slodov* decision clearly found that at the time Mr. Slodov gained control of the companies, and thus became a responsible person, the companies had no liquid assets and "the trust funds" withheld from the employees' paychecks had been spent previously. FBII relies heavily upon this decision, but there are some material distinctions between those facts and the ones proven in this dispute.

First, the *Slodov* decision involved a purchaser taking control over the corporation who was wholly unconnected to the corporate taxpayers prior to purchase. The issue was whether such an individual had any statutory responsibility to use after-acquired corporate funds to pay a tax obligation arising prior to his purchase. *See United States v. Bewley*, 212 B.R. 668, 674 (N.D.Okla.1997) ("The Supreme Court determined that under § 6672 one who assumes control of a business **does not** become a guarantor for payment of delinquent taxes simply by undertaking to continue operation of the business [citation omitted] [n]or does § 6672 operate to impress a trust on after-acquired cash."); *In re Rossiter*, 167 B.R. 919, 921 (Bankr. C.D.Cal.1994). Here, FBII was not a corporate outsider prior to October 18, 2001.

One cannot view the role of FBII in Pennsbury's affairs during the third and fourth quarters of 2001 as analogous to that of an outsider-individual who "purchased" the entity on October 18, 2001. *See Davis v. United States*, 961 F.2d 867, 873 (9th Cir.1992). As mentioned earlier, during the third quarter of 2001, FBII had sufficient influence over the financial operations of Pennsbury to be held a responsible person under section 6672. And when an individual has been a responsible person throughout the period when the taxes should have been collected and paid, but did not have knowledge of the tax delinquency until later, he has a duty to pay over all after-acquired funds to the IRS. *United States v. Vespe*, 868 F.2d at 1334 ("Since the jury found Vespe was a responsible person at the time the taxes were incurred, if he later became aware that

they were not paid and proceeded to pay other creditors in preference to the government, he acted willfully."); *see Thosteson v. United States,* 331 F.3d 1294, 1300 (11th Cir.2003) ("Even if a 'responsible' person is unaware that withholding taxes have gone unpaid in past quarters, a responsible person who becomes aware that taxes have gone unpaid in past quarters to which he was also a responsible person, is under a duty to use all 'unencumbered funds' available to the corporation to pay those back taxes."); *United States v. Kim,* 111 F.3d 1351, 1357 (7th Cir.1997); *Bradshaw v. United States,* 83 F.3d 1175 (10th Cir.1995); *Huizinga v. United States,* 68 F.3d 139, 145 (6th Cir.1995); *Purcell v. United States,* 1 F.3d 932, 938 (9th Cir. 1993); *Denbo v. United States,* 988 F.2d 1029, 1034 (10th Cir.1993); *Davis v. United States,* 961 F.2d at 874.

The Third Circuit Court of Appeals further observed in *Vespe* that "a responsible person when the taxes were incurred, does not meet his burden of proof simply by showing he was for some other reason unable to act willfully at that time. If Vespe knew of the delinquency or closed his eyes to it after his hospitalization, [and other creditors were paid], he is personally liable without regard to whether the company might have had to use funds other than those initially withheld." 868 F.2d at 1335.

Second, the Supreme Court also emphasized in *Slodov* that all funds generated after the purchaser took control were "not directly traceable to collected taxes...." 436 U.S. at 260, 98 S.Ct. 1778. In this dispute, the funds on hand when FBII assumed complete control of Pennsbury were the proceeds of receivables from jobs undertaken previously. The evidence demonstrates that receivables took time to collect, and that customers needed to be enticed to make prompt payments. Thus, it is highly likely that funds in the corporate accounts as of October 17, 2001 were derived from work done by Pennsbury no later than the third quarter of 2001.

Obviously, the proceeds of Pennsbury's receivables were derived from the goods and services provided by the corporate employees whose withholding taxes were not remitted to the IRS. Accordingly, there is a direct connection between the proceeds of those receivables available to FBII on October 18th, and the unpaid employment taxes. In contrast, the *Slodov* purchaser was required to loan money to his corporations to operate, and to pay for his inventory with cash upon delivery. 436 U.S. at 242, 98 S.Ct. 1778.

Thus, even if FBII first became a responsible person on October 18, 2001, when he officially assumed Pennsbury's presidency and exercised complete control of its operations and assets, there were corporate funds on hand, traceable to Pennsbury's operations during the third quarter of 2001, that could have been used to repay its employment tax obligation. This is an important distinction from *Slodov*. *See Purdy Company of Illinois v. United States,* 814 F.2d at 1188.

 As the *Slodov* decision makes clear, willfulness under section 6672 includes not simply knowledge and responsibility, but also an ability to pay. Here, on October 17, 2001 Pennsbury had $312,435.52 in cash on hand. *See* Finding of Fact ## 60, 61. Then, on November 1, 2001, the day after he signed the corporate tax return and clearly knew that Pennsbury's liability was unpaid, the company had sufficient funds in a bank account to repay the third quarter liability in full. *See* Finding of Fact # 61. In addition, in November 2001, Pennsbury, under the direction of FBII, paid other creditors more than $429,000. Finding of Fact # 63. Among the creditors paid were Branagan

Builders, corporate payroll obligations, and Premier Bank.

In challenging Pennsbury's ability to pay its tax debt, the debtors argue that Pennsbury had outstanding checks that reduced the amount available to FBII in October 2001. But this contention overlooks that FBII stopped payment on various checks to creditors that he thought were inappropriate or unnecessary. Thus, the record does not demonstrate an inability to pay the IRS claim due to insufficient funds.

The debtors also emphasize that Premier Bank held a security interest on all of Pennsbury's assets, including its cash and receivables. Based upon this security interest, they maintain that Pennsbury did not have any "unencumbered" funds, so they cannot be held to have willfully failed to pay over the funds.

As just noted, if at the time a responsible person first becomes aware of the tax delinquency, and afterwards no corporate funds were available to pay the corporation's tax obligation, then the responsible person cannot be held to have acted willfully. *See, e.g., United States v. Kim,* 111 F.3d at 1358 (a person is only liable to the extent unencumbered funds were available); *Browne v. United States,* 234 F.Supp. 19, 22 (D.Minn.1964) (individual found not to be a responsible person when no unencumbered funds existed because all funds were controlled by a lender).

The relevant inquiry is whether Pennsbury had available funds to repay its tax obligations on or after October 31, 2001, when the obligation became payable. The Eighth Circuit Court of Appeals, in *Honey v. United States,* limited the definition of encumbered funds in the context of section 6672 to funds that "the taxpayer is legally obligated to use ... for a purpose other than satisfying the preexisting employment tax liability and [where] that legal obligation is superior to the interest of the IRS in the funds." 963 F.2d at 1090; *see also In re Premo,* 116 B.R. at 535 (defining unencumbered funds as "funds which are available to the taxpayer for use in its discretion.").

Courts have generally adopted this narrow definition of encumbered funds propounded by the Eighth Circuit. *See, e.g., United States v. Kim,* 111 F.3d at 1359; *Huizinga v. United States,* 68 F.3d at 145; *Jenson v. United States,* 23 F.3d 1393, 1395 (8th Cir.1994), *Barnett v. IRS,* 988 F.2d 1449, 1458 (5th Cir.1993); *Mortenson v. United States,* 910 F.Supp. 1325, 1334 (N.D.Ill.1995); *State v. King,* 1995 WL 423171, at *7 (N.D.Ala.1995); *Michaud v. United States,* 40 Fed.Cl. 1, 24 n. 21 (Fed.Cl.1997), *Stevenson v. Tax Commission,* 112 P.3d at 1236. Furthermore, the debtors had the burden to demonstrate that no unencumbered funds existed that could have been used to pay the back taxes. *United States v. Kim,* 111 F.3d at 1359; *see also Barnett v. IRS,* 988 F.2d at 1458 (taxpayer bears the burden of showing that no unencumbered funds were available); *United States v. Vespe,* 868 F.2d at 1336 ("[S]ince the jury found him responsible for these taxes, the burden was on Vespe, in asserting he did not act willfully, to prove that [the company] did not have the needed funds."); *Honey v. United States,* 963 F.2d at 1091 (stating the burden is on the taxpayer to prove that the funds were encumbered).

As observed earlier, Premier Bank lent monies to Pennsbury in September of 2001, and it obtained a security interest in all corporate assets. Ex. PPP, ¶ 15. There also was no evidence that the IRS had placed a tax lien on the assets of Pennsbury prior to October 18, 2001. Accordingly, the bank's lien probably held priority over any IRS claim. *See Honey v.*

*United States,* 963 F.2d at 1091 ("Even if the IRS had obtained a tax lien under § 6321, a tax lien is subordinate to 'certain perfected security interests in certain collateral, including inventory, arising after the tax lien filing when pursuant to a security agreement entered into before the filing.' ") (quoting *Slodov v. United States,* 436 U.S. at 257, 98 S.Ct. 1778).

Nonetheless, the United States disputes that the Premier security interest rendered all of Pennsbury's assets encumbered funds within the meaning of section 6672. For the following reasons, I agree.

■ Courts have recognized that the existence of a lender's security interest in a corporation's assets, by itself, does not require that all corporate funds be treated as encumbered for purposes of section 6672. *See Honey v. United States,* 963 F.2d at 1091–93. In order to consider corporate funds to be encumbered for purposes of section 6672 liability, the security interest must also establish a restriction on the use of the funds. *See Id; In re Premo,* 116 B.R. at 536.

■ If a corporation can use its funds to pay legitimate corporate obligations, then such funds are not encumbered. *See United States v. Kim,* 111 F.3d at 1361 (unencumbered funds existed when a corporation's use of the funds was not actually restricted); *Purdy Co. of Illinois v. United States,* 814 F.2d at 1191 ("The mere fact that some other creditor, including the taxpayer, might be owed a debt by Pontiac— even a debt incurred against the (informal) security of the funds in question—does not alter the general requirement that such funds be paid over against back taxes."). *Compare Rykoff v. United States,* 40 F.3d 305 (9th Cir.1994) (funds were encumbered when a lender removed assets from bank account and the taxpayer could not access them); *United States v. Bank of Hawaii,* 2002 WL 1277955, at *6 (D.Haw.2002) (funds were encumbered when they were held by a bank in a suspense account to which the debtor did not have access).

Even a lock-box arrangement with a creditor can yield unencumbered funds, where incoming receipts were placed in a lock box at the bank and used to reduce amounts owed to the creditor, but then the bank would release funds to the debtor that could be used to repay creditors. *Bell v. United States,* 355 F.3d at 389; *see Purcell v. United States,* 1 F.3d at 938–39 (lock-box arrangement was not sufficient to prove that funds were encumbered); *Mortenson v. United States,* 910 F.Supp. at 1334 (a lockbox arrangement still results in unencumbered funds); *see also Jenson v. United States,* 23 F.3d at 1395 (funds were not encumbered when the secured creditor did not prohibit the taxpayer from paying other debts and only a small portion of the assets were actually paid to the creditor).[7]

---

7. Courts are also wary, given the policies implicit in section 6672, to treat voluntary restrictions on corporate assets as creating encumbered funds. For example, the court in *Bell* held that:

[c]orporate funds should not be considered encumbered simply because a contractual obligation with a lender or other creditor impacts a company's ability to use its assets, receivables, or loan advances with complete freedom. If this were the case, then nearly every responsible person involved with a failing company in the midst of credit problems or intricate loan arrangements would be able to avoid a finding of willfulness and thus evade liability. Such a result would undermine the purpose of § 6672 in assuring that trust fund taxes are paid to the government. 355 F.3d at 396; *see Bradshaw v. United States,* 83 F.3d at 1180–81 (funds are not encumbered when the restriction results from a voluntary agreement); *Kalb v. United States,* 505 F.2d 506, 510 (2d Cir.1974) (funds were unencumbered). Thus, funds are more likely to be treated as encumbered when the restrictions come not as a result of a voluntary

■ I conclude that the debtors did not meet their evidentiary burden to prove that the funds in Pennsbury's bank accounts in October and early November 2001 were encumbered and actually unavailable for payment to the IRS for purposes of this dispute. There was no evidence that Premier Bank restricted Pennsbury's use of the cash in its accounts. *See Brown v. United States,* 591 F.2d at 1141 (taxpayer must demonstrate an actual restriction). Indeed, Premier's security agreement authorized Pennsbury to pay its legitimate tax obligations as they came due.

I appreciate that Pennsbury held business checking accounts both at Premier Bank and First County Bank and that both lenders withdrew funds from those accounts in partial payment of the debts owed. Exs. J, O. Once those funds were withdrawn, they would be unavailable to repay the IRS. However, the earliest of these withdrawals happened on November 14, 2001, almost one month after FBII became president of Pennsbury and had knowledge the taxes were not paid. Exs. H, I, J, K. Additionally, hundreds of thousands of dollars worth of payments were paid to Pennsbury's creditors after October 18, 2001. Such payments were made at the direction of FBII, and included a $70,000 payment to Branagan Builders. Furthermore, given the debtors' guarantee to Premier, FBII had an incentive to favor that creditor.

Specifically, on October 31, 2001, the Premier Bank account had $374,795.83 on deposit, with an additional $10,585.13 in the First County Bank account. Exs. H, I, Q, X. Pennsbury deposited more than $72,000 in additional monies into the Premier Bank account during the month of November. *See* Ex. H. In early November 2001, FBII transferred $70,000 from Pennsbury to his company, Branagan Builders. *Id.;* Ex. Q. After FBII became president, Pennsbury paid numerous creditors, including its employees. Exs. H, I, J, X.

In addition to Pennsbury's cash assets, the corporation held more than $1.5 million in accounts receivables, including almost $800,000 in current receivables. Exs. M; UU. Several courts have construed the notion of unencumbered funds to include not only cash on hand and in bank accounts, but all liquid assets of the company including accounts receivables. *See Purdy Co. of Illinois v. United States,* 814 F.2d at 1191; *United States v. Bewley,* 212 B.R. at 675; *Landau v. United States,* 702 F.Supp. 199, 203 (N.D.Ill.1988). Clearly then, in October and November 2001, Pennsbury had sufficient unencumbered funds that could have been used to satisfy its delinquent tax obligation, but FBII choose to pay those funds to meet other Pennsbury obligations.

As mentioned earlier, a responsible person's use of unencumbered funds to repay non-IRS creditors can be considered willful, including the payment of wages to employees. *See Greenberg v. United States,* 46 F.3d at 244 ("Any payment to other creditors, including the payment of net wages to the corporation's employees, with knowledge that the employment taxes are due and owing to the Government, constitutes a willful failure to pay taxes."); *Sorenson v. United States,* 521 F.2d 325, 328 (9th Cir.1975); *Wetzel v. United States,* 802 F.Supp. at 1461; *Thurner v. United States,* 260 F.Supp. 292, 294 (E.D.Wis.1966).

agreement but from statutory directives. *Huizinga v. United States,* 68 F.3d at 145 (encumbered funds existed because the building funds were not property of the contractor due to the Michigan Builders Trust Fund Act).

 Federal law does not recognize as a valid excuse that Pennsbury's operations would have ceased (here, sooner) and the employees would have lost their jobs (here, earlier) if the required payments to the IRS had been made around October 31, 2001. *See Bell v. United States,* 355 F.3d at 397 ("It is no excuse now to argue that encumbrances impeded Bell's ability to remit the trust fund taxes, as Bell could have shut down the company, suspended operations, filed for bankruptcy, applied for a bridge loan from another lender, or simply violated his contract with Bank One instead of failing to fulfill his tax debt. None of these options is attractive or enviable, but in the eyes of § 6672(a), they are the correct choices."); *United States v. Kim,* 111 F.3d at 1361 n. 1 (It does not matter if the company would have gone out of business if it would have paid the IRS rather than the other creditors.); *Greenberg v. United States,* 46 F.3d at 244 ("It is no defense that the corporation was in financial distress and that funds were spent to keep the corporation in business with an expectation that sufficient revenue would later become available to pay the United States."); *Honey v. United States,* 963 F.2d at 1093 ("While there is some appeal in this line of analysis [payments were instead made to suppliers and others to keep the company operating], '[i]t is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business.'") (citation omitted); *State of Alabama v. King,* 1995 WL 423171, at *5 ("The law requires that even if the decision is difficult and the result devastating, the responsible person has a duty to pay over all unencumbered funds to the United States to pay the unpaid withholding taxes, or to be held liable for such failure.").

Therefore, FBII's failure to repay IRS after assuming complete control of Pennsbury was willful, both for the third and fourth quarters of 2001.

## V.

In sum, I conclude that FBII was a responsible person, within the meaning of section 6672, throughout the third and fourth quarters of 2001. Whether or not FBII willfully fail to remit withholding taxes to the IRS prior to October 18, 2001, he probably had actual knowledge of the unpaid withholding taxes as of that date and certainly knew of the withholding liability no later than October 31, 2001. Moreover, he acted with reckless disregard to the payment of the taxes from October 18, 2001 by using unencumbered funds to pay other creditors of Pennsbury, including his own company and a creditor for whom he had guaranteed repayment. He had a statutory duty to use his control of Pennsbury's unrestricted assets after October 17, 2001 to repay the corporate tax obligation before satisfying debts held by other corporate creditors. His failure to do so is deemed willful under 26 U.S.C. § 6672 of the United States Code, which imposes a penalty upon him for the full amount of the unpaid Pennsbury taxes.[8] *See Wetzel v. United States,* 802 F.Supp. at 1462 n. 6 ("Because Wetzel became a responsible person prior to the time that the 1986 last-quarter taxes were due to be paid (*i.e.,* January 31, 1987) it was his duty as a responsible person to pay over such taxes.").

An appropriate order will be entered.

---

8. Because I found FBII to be a responsible person who acted willfully, I need not reach the question of whether Mrs. Branagan is also a responsible person.

## ORDER

AND NOW, this 12th day of May 2006, for the reasons stated in the accompanying opinion, it is hereby ordered that the debtors' objections to proof of claim number 27 filed by the Internal Revenue Service are denied, and the proof of claim is hereby allowed.